**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| In re: § | Case No. 23-51742-cag | |
| CINCH WIRELINE SERVICES, LLC § | | |
| Debtor § | Chapter 7 | |
| _____ § | _____ | |
| JOHN PATRICK LOWE, CHAPTER 7 § | | |
| TRUSTEE FOR CINCH WIRELINE § | | |
| SERVICES, LLC § | | |
| Plaintiff § | | |
| § | Adversary 24-05011-cag | |
| v. § | | |
| § | | |
| CINCH ENERGY SERVICES, LLC; § | | |
| CINCH INVESTMENT HOLDINGS, LLC; § | | |
| CES GROUP HOLDINGS, LLC; HOOK N § | | |
| BULL PROPERTIES, LLC; LOS CABOS § | | |
| RANCH, LLC; FTS RANCH, LLC; FTSJR § | | |
| HOLDINGS, LLC; WFO HOMES, LLC; § | | |
| TEXAS COAST BUILDERS, LLC; 17 § | | |
| MAIN, LLC; GRANDER HOLDINGS, § | | |
| LLC; WFO, LLC; PONDER RANCH, § | | |
| LLC; BL EQUITY HOLDINGS, § | | |
| LLC; OCEAN FLOOR HOLDINGS, LLC; § | | |
| FRANK THOMAS SHUMATE; MARK § | | |
| LOPEZ; LORETTA L. HIGGINS; § | | |
| TIMOTHY GAINES POLLARD; JERRY § | | |
| MILLER and such other yet unknown § | | |
| Defendants ("JOHN DOE DEFENDANTS") § | | |
| Defendants § | | |

# EXPEDITED
### MOTION FOR SANCTIONS AND AWARD OF DAMAGES FOR KNOWING AND INTENTIONAL VIOLATION OF THIS COURT'S TEMPORARY RESTRAINING ORDER

**This pleading requests relief that may be adverse to your interests.**

**Relief could be granted earlier than 14 days of this Motion. If no timely response is filed within 14 days from this date, the relief requested herein may be granted without a hearing being held.**

**A timely filed response is necessary for a hearing to be held.**

TO THE CHIEF UNITED STATES BANKRUPTCY JUDGE CRAIG A. GARGOTTA:

John Patrick Lowe, Chapter 7 Trustee for Cinch Wireline Services, LLC ("Plaintiff", "Trustee", or "Cinch Wireline") files this Motion for Sanctions and Award of Damages for Knowing and Intentional Violation of This Court's Temporary Restraining Order entered April 10, 2024 (Dkt #8) and extended by further Order of this Court on April 24, 2024 and the Orders and stipulations compelling production of documents by Defendants Thomas Shumate and Loretta L. Higgins at the Debtor's Corpus Christi Facility and Yard on April 25, 2024, and would show as follows:

## I.
## PRELIMINARY STATEMENT

1. This Court has heard testimony and admitted business records evidence of significant and intentional violation of the automatic stay arising from the voluntary Chapter 7 Petition of Cinch Wireline Services, LLC ("Debtor" or "Cinch Wireline") as well as direct evidence of intentional destruction of the Debtor's books and records, of removing computers and instructing destruction of digital data, of moving and hiding the Debtor's equipment, of converting the name "Cinch Wireline" to a newly formed LLC, CES Group Holdings, LLC by Tom Shumate now using the d/b/a "Cinch Wireline, and the actual continuation of the wireline business previously conducted by the Debtor (secretly up to February 24, 2024) and after formation of CESGH, the continuation of the Debtor's business by CESGH.

2. The evidence is admitted that in November 2024 the Debtor was a going concern operating primarily out of the Corpus Christi facility, with more than 30 field employees, significant income and business, and substantial assets exceeding $16,307,431.24 [*See*, Debtor's Exhibit 68 Cinch Wireline Assets and costs, authenticated and verified by both Stacie Lopez Tomas and Loretta Higgins, CPA].

3. Financial records created and kept by Loretta Higgins establish that in the first four months of 2023, the Debtor had Construction" revenues totaling $7,497,921.43. *See*, Debtor's Exhibit 25 Cinch Wireline Services Condensed Statement of Operations, Monthly Numbers 2023, authenticated and verified by both Stacie Lopez Tomas and Loretta Higgins, CPA]. No other Cinch Wireline related affiliate did any "wireline" work.

4. In stark contrast, the evidence in this case also includes the Debtor's Schedules and Statements filed showing, 13 days later on December 13, 2024, petition date (the "Petition Date") a Debtor having no assets and no operations; in other words, a "no asset" case. Remarkably, the Schedule of Assets was amended April 29, 2024 and signed by Frank Thomas Shumate, Jr. ("Shumate) also listing zero assets (no hard assets, no cash, no accounts receivables, *etc*.). What has been discovered by the Trustee is that a new enterprise somehow began doing business as "Cinch Wireline" with its operations wholly unreported to the Trustee, but using the same "Cinch Wireline Services, LLC's" (the Debtor's) employees, same assets, same customers, same vendors, and same management but now by a newly formed limited liability company "CES Group Holdings, LLC" owned and formed by Shumate.

5. Since mid-December 2023 the Trustee has diligently attempted to obtain information about the Debtor, its business records, its assets, and its operations, but has been stonewalled at every effort even when ordered to do so by this Court. Incredibly, the Debtor's vice-president Tim Pollard (who signed the verified Schedules and Statements) had no knowledge of assets or even bank accounts of the Debtor, while Shumate (and pursuant to his direction and instructions), Higgins, Pollard, and others have moved and hidden Debtor's assets, burned the Debtor's business records, hidden and refused to turn over computers containing Debtor's business records, and refused to accept and actively dodged service of this Court's subpoenas for records

and appearances to testify about these activities. Pollard has refused to testify by pleading the fifth amendment arising out of a federal indictment for failure to pay over 940-941 withholding taxes for an entity not involved in these documents search and an indictment having nothing to do with this case or this Debtor.

6. The recent stipulations and this Court's order to turn over all records of the Debtor needed by the Debtor and located at the Debtor's Corpus Christi yard was no such production, but simply a continuation of the obstruction of this Trustee's efforts to understand the Debtor's estate. After traveling to the Corpus Christi Yard, the Trustee's counsel was met by Shumate's lawyer (Paul O'Finan) who immediately refused access to the Debtor's business office to review and pick up records of the Debtor, refused access to the conference room where the Debtor's computers were kept (claiming Shumate that morning instructed him to deny access), had the police called to escort Trustee's counsel for the remaining efforts to find and take possession of the Debtor's books and records (apparently to assure that no view of the Debtor's own offices would be permitted). In short, after being told by Shumate's lawyer O'Finan that the records only consisted of approximately 14 small bankers-boxes of information, and after defying O'Finan's demand not to walk around the yard or go into any building except the three small rooms initially directed and instructed by lawyer O'Finan, Trustee's counsel discovered another office at the back of the yard (an office Higgins referred to as the "Way-Back Office") containing substantial employee records, including the records Higgins testified did not exist (Michael Mendieta's employment records). Finally, Debtor's counsel discovered what appeared to the police as a second burn pit.

7. To this day, the Trustee does not have access to the computerized accounting records or the passwords to gain access. This refusal to turnover these records, physical blocking of the Trustee's counsel in his efforts to discover assets in the Debtor's own business office, and

failure to provide computer access are in contempt of this court and amount to obstruction of justice.

8. The continued blocking by Defendants of the Trustee from access to the truth illustrate the extent to which Defendants have no regard for this Court's Orders and more importantly do not understand the scope of this Court's jurisdiction over the "property of the estate" of this Debtor nor the nationwide jurisdiction of this Court to control the abuse and violation of the Bankruptcy Code provisions and this Court's Orders.

9. A portion of the sanctionable conduct is part of this Court's record of the hearing on the request for an Injunctive relief, and accordingly, occurred before this Court through testimony, and statements and stipulation of counsel on the record in those proceedings.

## II.
## JURISDICTION AND VENUE

10. This Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 105, 157 and 1334. Venue is proper pursuant to 28 U.S.C. § 1408. This is a core proceeding pursuant to 28 U.S.C. § 157(b) arising from the Debtor's filing of its voluntary Petition under Title 11 U.S.C. § 1101, *et seq* on December 12, 2023.

11. The statutory predicates for the relief sought herein include sections 105(a) and § 361, 362(d) of title 11 of the United States Code (the "Bankruptcy Code") and Rule 4001, 9014, 4001(a)(1) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"). Herring Bank

12. This pleading is filed both in the Adversary above referenced and in the Main Case out of which subpoenas have been issued seeking information and documents, and testimony has occurred including the Section 341 Meetings of Creditors.

# III.
## STATEMENT OF COUNSEL FOR THE TRUSTEE REGARDING EFFORTS TO OBTAIN PRODUCTION PURSUANT TO THIS COURT'S ORDERS

13. On April 25, 2024, this Court entered an Order extending (Dkt #52) its April 10, 2024 Temporary Restraining Order ("TRO"), in part compelling production of *all hard copies and digital copies of the business records* of the Debtor and all Defendants business records if kept by or in the possession of, Mrs. Loretta Higgins (the "Business Records"). An agreement was reached and stated on the record before the Court regarding the production of the digital records and the necessary access information (passwords, codes, or special procedures or protocol) to all servers containing the digital records. Access to digital Business Records requires passwords and log-in information and procedures to servers and to all laptop computers containing the Business Records. An agreement was also reached that all non-digital copies of the Business Records announced to the Court that provided for production on April 26, 2024, commencing at 10:00 AM in the Cinch Wireline Services, LLC yard and business offices on Agnes Street, Corpus Christi, Texas.

14. The stipulation did not include attendance by Shumate's counsel, nor did it include a restriction imposed by Shumate through his counsel, that the Debtor's offices could not be accessed to obtain business records of the Debtor. That restriction was unilaterally imposed by Shumate's counsel O'Finan when Debtor's counsel traveled to the Corpus Christi yard notwithstanding this Court's Order and the Stipulations.

15. According to the stipulation the Trustee was entitled to "all business records the Trustee needed" to commence his work in this case. Such an order could have no meaning if Shumate and his counsel could restrict Trustee's counsel to only three small rooms in a massive complex including an estimated 7,000 sq. ft. of business offices, over 15,000 sq. ft. of maintenance

shops all full of "equipment", "tools", and inventory which, on information and belief, belong to the Debtor.

16.     However, on arrival Higgins was not on location but had called that she would be 10 to 15 minutes late.  Mr. O'Finan was present and instructed that nothing could begin until Mrs. Higgins arrived.  Trustee's counsel disagreed and started to enter the Debtor's business office to review the physical location of business records stored, refusing to be limited to the three small upstairs offices or Mrs. Higgins.  When Trustee's counsel attempted to enter the business office, Shumate's counsel O'Finan stood in front to block the hallway and refused to allow the Trustee's counsel to pass.  Trustee's counsel asked if access required that he "touch" Mr. O'Finan in order to gain entry, which response was "whatever you need to do" at which time Trustee's counsel returned to the outside of the building.

17.     At about the same time Mrs. Higgins arrived, also two Corpus Christi police department cars arrived.  Mr. O'Finan had called the police to assure that the Trustee's counsel could not gain access to the Debtor's offices.  Mr. O'Finan met with the officers for several minutes and, according to the police, told the police officers that Trustee's counsel was violating an order of this Court by seeking to search for documents and not simply agreeing to restrict his discovery to picking up designated documents. Both officers told Trustee's counsel that they had been advised that Trustee's counsel was violating a federal court order that did not permit access to the business offices.  Thereafter, both officers requested that Trustee's counsel follow Shumate's instructions and not enter the Debtor's office, and thereafter escorted Trustee's counsel in all documents retrieval from the three small rooms.

18.     After Trustee's counsel retrieved the almost useless and minimal documents from the three small rooms, Trustee's counsel then, in the presence of both O'Finan and Mrs. Higgins,

inquired about the office in the back of the yard (250 yards or so away from the front main business office – *See* photo below). Mr. O'Finan said he was unaware of any other business office with records but when asked Mrs. Higgins admitted that there was one other office that "may have some records." Trustee's counsel demanded access and at that point the officers basically stood down from any effort to restrict the Trustee's Counsel from the back office. Below is an arial of the Debtor's Corpus Christi Yard facility showing the front main office and the "Way-Back Office":



19. When the other Way-Back Office was inspected in fact substantially more business records were found by Trustee's counsel than were in the three small offices. Multiple file cabinets

were emptied, multiple desks were accessed and emptied) and significant documents that did not appear to have been pilfered were discovered, included the documents Mrs. Higgins had testified did not exist – the employee files on Michael Mendietta. These were boxed and possession was taken.

20. After mentioning the existence of a burn pit to the police officers, on the way back to the main building the police officers pointed out to Trustee's counsel an area that looked like disturbed ground where a burn had occurred. Upon closer inspection, burned paper was found on the surface of the freshly turned dirt such that it appears a second burn pit exists shown by the following photograph taken during the inspection:



The photo above shows the location of the suspected second burn pit. Further investigation must be undertaken to determine if this is in fact another burn pit unknown to Oscar Loya or the Trustee.

21. The results of the efforts to retrieve documents, but for the forced disclosure of the "Way-Back Office" documents and a possible second burn pit, was marginal. The documents to be produced were disorganized, of minimal significance to current or recent operations, had clearly been selected (*See*, *e.g.*, photo of "Complete ATF" notebook with nothing inside):



22. As a result of the search of the Corpus Christi Yard the Trustee still has no significant business records (but may be receiving the passwords and log-in protocol promised last week, although that is in violation with the Court's order) and has no information on the disappearance from the books and records of all of the Debtor's assets *counted in November 2023 in the multi-millions*. [See, Debtor's Exhibit 68]. These documents exist likely, if at all, only in the office of CESGH at the locked CC Yard or the Midland yard, both locations of the Debtor. The Trustee has no access to its own business office, much less the records kept therein.

### IV.
### ARGUMENTS AND AUTHORITIES

23. Because bankruptcy courts were created by Congress rather than under Article III of the U.S. Constitution, is no disagreement over whether bankruptcy courts, like other federal courts, have "inherent authority" to impose sanctions for civil contempt on parties that refuse to comply with their orders. The U.S. Court of Appeals for the Second Circuit, in *In re Markus*, 78

F.4th 554 (2nd Cir. 2023) summarized this authority.[1] In so ruling, the Second Circuit reaffirmed its and other Circuit Courts' earlier decisions concluding that a bankruptcy court has the inherent authority to impose civil sanctions for contempt and the inherent authority to include punitive civil contempt sanctions:

> we hold that a bankruptcy court's inherent sanctioning authority includes the power to impose civil contempt sanctions in non-nominal amounts to compensate an injured party and coerce future compliance with the court's orders. *Id.* at 566.

"The power to punish for contempts is inherent in all courts…." *See Ex parte Robinson*, 86 U.S. (19 Wall.) 505, 510 (1874). *Gompers v. Bucks Stove & Range Co.*, 221 U.S. 418, 450 (1911):

> [T]he power of courts to punish for contempts is a necessary and integral part of the independence of the judiciary, and is absolutely essential to the performance of the duties imposed on them by law…. If a party can make himself a judge of the validity of orders which have been issued, and by his own act of disobedience set them aside, then are the courts impotent, and what the Constitution now fittingly calls the 'judicial power of the United States' would be a mere mockery.")….

24. It is civil contempt that is sought here, and which is designed to preserve and enforce compliance with court orders and to compensate injured parties for losses sustained from noncompliance. *See Downey v. Clauder*, 30 F.3d 681, 685 (6th Cir. 1994). Addressing "contempts," 18 U.S.C. § 401 of the U.S. Code provides:

> A court of the United States shall have power to punish by fine or imprisonment, or both, at its discretion, such contempt of its authority, and none other, as—
> (1) Misbehavior of any person in its presence or so near thereto as to obstruct the administration of justice;
> (2) Misbehavior of any of its officers in their official transactions;
> (3) Disobedience or resistance to its lawful writ, process, order, rule, decree, or command.

This Bankruptcy Court possess the power to punish by civil contempt.[2]

---

[1] The court of appeals affirmed a bankruptcy court decision imposing sanctions on a chapter 15 debtor's lawyer who repeatedly flouted the court's discovery orders and awarding attorneys' fees to the debtor's foreign representative incurred in bringing a motion for sanctions.

[2] In addition, if a party fails to comply with a subpoena issued in connection with discovery, Rule 45 of the Federal Rules of Civil Procedure provides that "[t]he court for the district where compliance is required—and also, after a

25. A debtor's request for sanctions for violating an order of this Court including violating this Court's orders and violating the automatic stay (here, seizing, hiding, using, concealing Debtor's assets) constitutes a contested matter. As such, it is governed by Federal Rule of Bankruptcy Procedure 9014 and should be commenced by motion thereunder. By bringing such a contested matter, in particular in this Adversary Proceeding, both injunctive relief and sanctions are available. The bankruptcy courts have the power under 11 U.S.C.A. § 105, and Bankruptcy Rule 9020, to impose contempt sanctions for violations of its orders, and the same power to punish for violating the automatic stay. *See, Fleet Mortg. Group, Inc. v. Kaneb*, 196 F.3d 265, 269 (1st Cir. 1999) (citing cases). Many courts have recognized that bankruptcy courts have civil contempt power flowing not only from "the inherent power of a court to enforce compliance with its lawful orders," but also from section 105(a) of the Bankruptcy Code, which provides that:

> [A bankruptcy] court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code].... *No provision of [the Bankruptcy Code] providing for the raising of an issue by a party in interest shall be construed to preclude the court from, sua sponte, taking any action or making any determination necessary or appropriate to enforce or implement court orders or rules, or to prevent any abuse of process*.

11 U.S.C. § 105(a) (emphasis added).[3] For instance, if the elements are found, an award of damages under § 362(h) is mandatory, and an award of damages under § 105(a) is discretionary. *Id*.[4]

---

motion is transferred, the issuing court—may hold in contempt a person who, having been served , fails without adequate excuse to obey the subpoena or an order related to it. Fed. R. Civ. P. 45(g).

[3] *See In re Walker*, 257 B.R. 493, 496 (Bankr. N.D. Ohio 2001) (citations omitted); *accord In re Roman Cath. Church of Archdiocese of New Orleans*, 2023 WL 4105655, *16 (E.D. La. June 21, 2023); *In re City of Detroit*, 653 B.R. 874, 892 (Bankr. E.D. Mich. 2023); *In re Kwok*, 653 B.R. 480, 489 (Bankr. D. Conn. 2023); *In re Brown*, 2023 WL 4496925, *4 (Bankr. N.D. Ga. July 12, 2023).

[4] *See, also*, *In re Rhodes*, 155 B.R. 491, 495 (W.D. Ark. 1993) (court affirms an offset of an entire prepetition tax claim of $12,313.92 asserted by the Internal Revenue Service against its liabilities for violating the automatic stay); *In re Chavis*, 213 B.R. 462, 464 (Bankr. E.D. N.C. 1997) (court fined creditor $10,000 for sending certain collection letters to the debtor); *In re McCormack*, 203 B.R. 521, 30 Bankr. Ct. Dec. (CRR) 45 (Bankr. D. N.H. 1996)($10,000 sanction imposed for failure to delete disallowed attorneys' fees from statements); *Matter of Toll*, 175 B.R. 406, 409 (Bankr. N.D. Ala. 1994) (court awards damages of $1,000 for each of five days, $10,000 punitive damages, plus attorneys' fees against a creditor who removed the debtor's household goods in violation of the

26. This Court's TRO and Orders from the bench pursuant to stipulations agreed to and imposed on the Debtor's owners and accountants imposed additional restrictions and mandates beyond the automatic stay, including the restriction on refusing to turnover records. Although there are numerous examples of knowing and intentional violations of the automatic stay, this Motion is directed to such specific violations of this Court's orders (including the removal of "evidence" in the possession of the Whistleblower, evidence of the d/b/a "Cinch Wireline" operations by CESGH in Midland, Texas, as well as photographs and information about the use of the Debtor's equipment and employees, signage, and logos, burning of evidence, and finally, *refusal to allow access to the Debtor's business offices for records retrieval*) and other unlawful or contempt acts.[5]

27. Plaintiff Trustee believes that sanctions should include an amount deemed necessary to not only compensate for the months-delay in discovering the truth about this debtor, but additional amounts to discourage the named Defendants including CESGH from continuing their violations of the automatic stay and this Court's orders.

WHEREFORE, the Trustee for the estate of Cinch Wireline Services, LLC requests that the Court find that cause exists for finding that the named Defendants Frank Thomas Shumate, Jr. and the newly formed entity CES Group Holdings, LLC, have knowingly and intentionally violated the TRO and orders of this Court as well as automatic stay, and that further injunctive relief and sanctions are appropriate, and the entry of an order, substantially in the form filed along

---

automatic stay); and *In re B. Cohen & Sons Caterers, Inc.*, 97 B.R. 808, 816-19 (Bankr. E.D. Pa.), *aff'd in part & remanded in Part*, 108 B.R. 482 (E.D. Pa. 1989), *appeal dismissed*, 908 F.2d 961 (3d Cir. 1990), *clarified on remand*, 1990 WL 2632 (Bankr. E.D. Pa. Jan. 11, 1990), *aff'd*, 124 B.R. 642 (E.D. Pa.), *aff'd*, 944 F.2d 896 (3d Cir. 1991) (debtor awarded $50,000 actual damages, $10,000 punitive damages, the striking of a proof of claim filed in the amount of approximately $270,000, plus attorneys' fees for landlord's destruction of the debtor's property in violation of the automatic stay).

[5] The acts of retaliation of these Individual Defendants and CESGH, including withholding the Whistleblower's paycheck, withholding medical insurance payments for treatments and needed treatments of the Whistleblower and his wife, and firing of the Whistleblower will be addressed in a separate motion.

with this Motion (a) granting the Motion, and (b) granting such other and further relief as the Court deems appropriate.

Dated: April 29, 2024.

            Respectfully submitted,

By:  /s/ *Butch Boyd*
    Butch Boyd
    State Bar No. 00783694
    Butch Boyd Law Firm, P.C.
    2905 Sackett Street
    Houston, TX 77098
    713.589.8477
    713.589.8563 (Fax)
    Email: butchboyd@butchboydlawfirm.com

    Shelby A. Jordan
    St. Bar No. 11016700
    Antonio Ortiz
    St. Bar No. 24074839
    ***JORDAN & ORTIZ, P.C.***
    500 North Shoreline Blvd., Suite 804
    Corpus Christi, TX 78401
    Telephone: 361.884.5678
    Facsimile: 361.888.5555
    Email:  sjordan@jhwclaw.com
          aortiz@jhwclaw.com
    Copy to: cmadden@jhwclaw.com
    **SPECIAL COUNSEL FOR JOHN PATRICK LOWE, CHAPTER 7 TRUSTEE**

# CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the Witness and Exhibit List was served to the below, by the CM/ECF system; by electronic mail on April 29, 2024:

| | | |
|---|---|---|
| **Aaron Matthew Guerrero**<br>Bond Ellis Eppich Schafer Jones LLP<br>950 Echo Lane<br>Suite 120<br>Houston, TX 77024<br>713-335-4838<br>832-740-1411 (fax)<br>aaron.guerrero@bondsellis.com<br>*Assigned: 04/26/2024* | representing | **17 Main, LLC**<br>c/o Daniel Namvar, Registered Agent<br>9135 Hilllsboro Dr<br>Los Angeles, CA 90034<br>*(Defendant)* |
| **Paul W. O'Finan**<br>S M Chaudhry, Esq., Attorney at Law PLLC<br>14100 San Pedro Ave, Suite 210<br>San Antonio, TX 78232<br>(210) 646-9400<br>(210) 646-0038 (fax)<br>paul@smcesq.com<br>*Assigned: 04/24/2024* | representing | **Frank Thomas Shumate**<br>6118 King Trail<br>Corpus Christi, TX 78414<br>*(Defendant)* |

*/s/ Shelby A. Jordan*
Shelby A. Jordan