## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## (SAN ANTONIO DIVISION)

| | | |
|---|---|---|
| In re: | § | |
| **CINCH WIRELINE SERVICES, LLC** | § | Case No. <u>23-51742-cag</u> |
| **Debtor** | § | **Chapter 7** |
| _____ | § | _____ |
| | § | |
| **JOHN PATRICK LOWE, CHAPTER 7** | § | |
| **TRUSTEE FOR CINCH WIRELINE** | § | |
| **SERVICES, LLC,** | § | |
| **Plaintiff** | § | |
| **v.** | § | |
| | § | |
| | § | **Adversary 24-05011-cag** |
| **FRANK THOMAS SHUMATE; MARK** | § | |
| **LOPEZ; LORETTA L. HIGGINS;** | § | |
| **TIMOTHY GAINES POLLARD; JERRY** | § | |
| **MILLER; MARTIN KROESCHE;** | § | |
| [THE "INDIVIDUAL-DEFENDANTS"] | § | |
| **CINCH ENERGY SERVICES, LLC;** | § | |
| **CINCH INVESTMENT HOLDINGS, LLC;** | § | |
| **CES GROUP HOLDINGS, LLC; HOOK N** | § | |
| **BULL PROPERTIES, LLC; LOS CABOS** | § | |
| **RANCH, LLC; FTS RANCH, LLC; FTSJR** | § | |
| **HOLDINGS, LLC; WFO HOMES, LLC;** | § | |
| **TEXAS COAST BUILDERS, LLC; 17** | § | |
| **MAIN, LLC; GRANDER HOLDINGS,** | § | |
| **LLC; WFO, LLC; PONDER RANCH,** | § | |
| **LLC; BL EQUITY HOLDINGS, LLC;** | § | |
| **OCEAN FLOOR HOLDINGS, LLC;** | § | |
| **SUPERIOR READY MIX OF TEXAS,** | § | |
| **LLC; SUPERIOR READY MIX, LLC;** | § | |
| **CAPITAL PROPERTY INVESTING,** | § | |
| **LLC;  CORE ASSET RESOURCES,** | § | |
| **LLC; DRAKEFIRE MANAGEMENT,** | § | |
| **LLC;  EDMUND HOME BUILDERS,** | § | |
| **LLC; CHATTINGTON INVESTMENTS,** | § | |
| **LLC; WILLIAM H HOLDINGS, LLC;** | § | |
| **LONE STAR CEMENT COMPANY, LLC;** | § | |
| **TIM POLLARD CONSTRUCTION, INC.** | § | |
| [The "Entity Defendants"] | § | |
| **and Other Yet UNKNOWN DEFENDANTS** | § | |
| ["John Doe-Defendants"];  and | § | |
| **SIMMONS BANK** | § | |
| **Defendants** | § | |

First Amended Complaint

**FIRST AMENDED COMPLAINT
TO RECOVER ASSETS AND ACTUAL AND PUNITIVE DAMAGES FOR FRAUD, ACTUAL
AND CONSTRUCTIVE FRAUDULENT TRANSFERS, RECOVERY FOR THE RESULTING
TRUST IN FAVOR OF PLAINTIFF, AND
RELATED INJUNCTIVE, DECLARATORY, AND EQUITABLE RELIEF**

TO THE CHIEF UNITED STATES BANKRUPTCY JUDGE CRAIG A. GARGOTTA:

John Patrick Lowe, Chapter 7 Trustee for Cinch Wireline Services, LLC ("Plaintiff-Debtor",

"Trustee", or "Cinch Wireline") files this FIRST AMENDED Complaint to Recover Assets And Actual And

Punitive Damages for Fraud, Actual and Constructive Fraudulent Transfers, Recovery for the Resulting Trust

in Favor of Plaintiff, and Related Injunctive, Declaratory, and Equitable Relief, including Preliminary and

Permanent Injunctive Relief, complaining of Cinch Energy Services, LLC, Cinch Investment Holdings, LLC,

CES Group Holdings, LLC; Hook N Bull Properties, LLC; Los Cabos; Ranch, LLC; FTS Ranch, LLC,

FTSJR Holdings, LLC, WFO Homes, LLC, Texas Coast Builders, LLC, 17 Main, LLC, Grander Holdings,

LLC, WFO, LLC, Ponder Ranch, LLC, BL Equity Holdings, LLC, Ocean Floor Holdings, LLC, Superior

Ready Mix Of Texas, LLC; Superior Ready Mix, LLC; Capital Property Investing, LLC; Core Asset

Resources, LLC; Drakefire Management, LLC; Edmund Home Builders, LLC; Chattington Investments,

LLC; William H. Holdings, LLC; Lone Star Cement Company, LLC; and Tim Pollard Construction, Inc.,

and such other as yet unknown Entity-Defendants ("John Doe Entity-Defendants") (collectively the "Entity-

Defendants") and Frank Thomas Shumate ("Shumate"), Mark Lopez ("Lopez"), Loretta L. Higgins

("Higgins"), Timothy Gaines Pollard ("Pollard"), Jerry Miller ("Miller"), and Martin Kroesche ("Kroesche");

Simmons Bank; and such other as yet unknown Individual-Defendants ("John Doe Individual-Defendants")

(collectively the "Individual-Defendants"), and  Simmons Bank ("Simmons"), successor-by-merger to

Spirit of Texas Bank, SSB ("Spirit")and would show as follows:

# I.
# PARTIES

**A.      Plaintiff Trustee for the Estate of Cinch Wireline Services, LLC ("Plaintiff" or "Debtor")**

1.      **Plaintiff-Debtor** is the duly appointed, qualified, and serving Chapter 7 Trustee ("Trustee" or "Plaintiff") of the Estate of Cinch Wireline Services, LLC ("CWS", "Cinch Wireline" or "Debtor") appointed by order of this Court dated December 13, 2023 [Dkt #2] with constitutional and statutory standing to bring the complaints alleged herein.

**B.      The Individual Defendants:**

2.      **Frank Thomas Shumate** ("Shumate") is a citizen of the State of Texas who may be served with process at 6118 King Trail, Corpus Christi, TX 78414 or wherever Shumate may be found. Shumate has made an appearance in this matter.

3.      **Mark Lopez** ("Lopez") is a citizen of the State of Texas who may be served with process at 52 County Road 3011, Edna, Texas 77957 or wherever Lopez may be found. Lopez has made an appearance in this matter.

4.      **Loretta L. Higgins** ("Higgins") is a citizen of the State of Texas who may be served with process at 24030 Tirso River Court, Katy, Texas 77493 or wherever Higgins may be found. Higgins has made an appearance in this matter.

5.      **Timothy Gaines Pollard** ("Pollard") is a citizen of the State of Texas who may be served with process at 2200 County Road 413, McCoy, Texas 78113 or wherever Pollard may be found. Pollard has made an appearance in this matter.

6.      **Jerry Miller** ("Miller") is a citizen of the State of Texas who may be served with process at 137 W. Chandler Road, Sarita, Texas 78385 or wherever Miller may be found.  Miller has made an appearance in this matter.

7.      **Martin Kroesche** ("Kroesche") is a citizen of the State of Texas who may be served with process at 111 West Olmos Drive, San Antonio, Texas 78212 or where Kroesche may be found.

C.      **The Entity-Defendants:**

8.      **BL Equity Holdings, LLC** ("BLEH") is a Delaware limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Delaware is A Registered Agent, Inc. 8 The Green, Suite A, Dover, DE 19901. Additionally, as no agent is maintained in Texas., service may be made upon the Secretary of State of Texas. BLEH has been served with Summons on April 15, 2024 [Docket #44] and has had a default entered against it on June 14, 2024 [Dkt #164].

9.      **Cinch Energy Services, LLC** ("CES") is a Texas limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Texas is Mark Lopez, 1102 S. Second, Ganado, Texas 77962. Cinch Energy has made an appearance in this matter.

10.      **Cinch Investment Holdings, LLC** ("CIH") is a Texas limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Texas is Frank T. Shumate, Jr., 2200 County Road 413, McCoy, Texas 78113. CIH has made an appearance in this matter.

11.      **CES Group Holdings, LLC** ("CESGH") is a Texas limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Texas is Frank T. Shumate, Jr., 2200 County Road 413, McCoy, Texas 78113. CESGH has made an appearance in this matter.

12.      **Capital Property Investing, LLC** ("CPI") is a Wyoming limited liability company

with one or more member(s) being Texas citizens or domiciled in Texas. Additionally, as no agent is maintained in Texas., service may be made upon the Secretary of State of Texas through its registered agent, Capital Administrations LLC, at 1712 Pioneer Avenue, Suite 115, Cheyenne, WY 82001.

13. **Chattington Investments, LLC** ("Chattington") is a Texas limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Texas is MKE Capital Management, 111 West Olmos Drive, San Antonio, Texas 78212.

14. **CORE Asset Resources** ("Core") is a Wyoming limited liability company with its registered agent Capital Administrations LLC 1712 Pioneer Ave Ste 115 Cheyenne, WY 82001. Additionally, as no agent is maintained in Texas., service may be made upon the Secretary of State of Texas.

15. **Drakefire Management, LLC** ("Drakefire") is a Delaware limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process is A Registered Agent, Inc., 8 The Green, Suite A, Dover, Delaware 19901. Additionally, as no agent is maintained in Texas., service may be made upon the Secretary of State of Texas.

16. **Edmund Home Builders, LLC** ("EHB") is a Texas limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Texas is Frank T. Shumate, Jr., 2200 County Road 413, McCoy, Texas 78113.

17. **FTS Ranch, LLC** ("FTSR") is a Texas limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Texas is Frank T. Shumate, Jr., 2200 County Road 413, McCoy, Texas 78113. FTS has made an appearance in this matter.

18. **FTSJR Holdings, LLC** ("FTSJR") is a Texas limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in

Texas is Frank T. Shumate, Jr., 2200 County Road 413, McCoy, Texas 78113. FTSJR has made an appearance in this matter.

19. **Grander Holdings, LLC ("Grander")** is a Texas limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Texas is Frank T. Shumate, Jr., 2200 County Road 413, McCoy, Texas 78113. Grander has made an appearance in this matter.

20. **Hook N Bull Properties, LLC** ("HNB") is a Texas limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Texas is Frank T. Shumate, Jr., 2200 County Road 413, McCoy, Texas 78113. HNB has made an appearance in this matter.

21. **Los Cabos Ranch, LLC** ("LCR") is a Texas limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Texas is Paul S Kirklin, 12600 N. Featherwood Drive, Suite 225, Houston, Texas 77034. LCR has made an appearance in this matter.

22. **17 Main, LLC** ("17Main") is a California limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process is Daniel Namvar, who may be served at 9135 Hillsboro Dr., Los Angeles, California, 90034. Additionally, as no agent is maintained in Texas., service may be made upon the Secretary of State of Texas. 17Main has made an appearance in this matter.

23. **Lone Star Cement Company, LLC** ("LSCC") is a Texas limited liability with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Texas is Tim Pollard, 146 Motts Parkway, Marion, Texas 78214 or wherever he may be found.

24.     **Ocean Floor Holdings, LLC** ("OFH") is a Delaware limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Delaware is A Registered Agent, Inc. 8 The Green, Suite A, Dover, DE 19901. Additionally, as no agent is maintained in Texas., service may be made upon the Secretary of State of Texas. OFH has made an appearance in this matter.

25.     **Ponder Ranch, LLC ("Ponder")** is a Texas limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Texas is Frank T. Shumate, Jr., 2200 County Road 413, McCoy, Texas 78113. Ponder has made an appearance in this matter.

26.      **Superior Ready Mix of Texas, LLC** ("SRMT") is a Texas limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Texas is Frank T. Shumate, Jr., 2200 County Road 413, McCoy, Texas 78113.   SRMT is currently in its Chapter 11 case, and this filing is for notice only because the Court in which SMRT is pending is the same court of this Adversary.   No attempt to proceed against SMRT or its assets will be made until the automatic stay is lifted or modified or its counsel agrees and stipulates to any such proceeding.[1]

27.     **Superior Ready Mix, LLC** ("SRM") is an Alabama limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Texas is Frank T. Shumate, Jr., 2200 County Road 413, McCoy, Texas 78113.

28.     **Texas Coast Builders, LLC** ("TCB") is a Texas limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Texas is Frank T. Shumate, Jr., 2200 County Road 413, McCoy, Texas 78113. TCB has made an appearance

---

[1]     Plaintiff's counsel discussed the addition of SMRT as an Entity-Defendant with its counsel without proceeding with service of process (although a copy of this First Amended Complaint will be furnished to counsel but only for disclosure and ease of further proceeding in this Court) as permitted once a stipulation between counsel or a lift stay order has been approved by this Court.

First Amended Complaint

in this matter.

29. **WFO, LLC ("WFO")** is a Texas limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Texas is Tim Pollard, 146 Motts Parkway, Marion, Texas 78124. WFO has made an appearance in this matter.

30. **WFO Homes, LLC** ("WFOH") is a Texas limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Texas is Tim Pollard, 146 Motts Parkway, Marion, Texas 78124. WFOH has made an appearance in this matter.

31. **William H Holdings, LLC** ("WHH") is a Texas limited liability company with one or more member(s) being Texas citizens or domiciled in Texas and whose registered agent for service of process in Texas is Jerry W. Miller, 137 West Chandler, Sarita, Texas 78385.

32. **Simmons Bank** ("Simmons") is a nationally chartered banking house with its principal place of business in Pine Bluff Arkansas and whose registered agent for service of process in the State of Texas is Charles K. Eastman, 2200 West 7th Street, Suite 212, Fort Worth, Texas 76107.

**D.    John Doe Defendants**

33. **The Individual John Doe-Defendants** - Such other as-yet unknown Individual-Defendants (herein "John Doe-Individual Defendants"), which, if added, will be an additional Individual-Defendant.

34. **The John Doe Entity-Defendants** - Such other as-yet unknown Entity-Defendants (herein "John Doe-Entity Defendants"), which, if added, will be an additional Entity-Defendant.

**E**.    As used herein, each above-named corporate[2] or limited liability company named as Defendants together with any identified John Doe Entity-Defendants are collectively referred to as "**Entity-Defendants**".  Shumate, Lopez, Higgins, Pollard, Martin Kroesche, and Miller, and

---

[2]    For the purpose of this Complaint the term "Entity-Defendant" does not include Simmons Bank.

First Amended Complaint

together with any identified Individual John Doe-Defendants, as members of the civil conspiracy described herein are collectively referred to as "**Individual-Defendants**" and collectively the Entity-Defendants, the Individual-Defendants and the John Doe-Defendants are referred to as "Defendants".

35.     Defendants are alleged to be members[3] or instrumentalities[4] of the civil conspiracy described below, operating as the "Control Persons" of each Entity-Defendant by the ongoing civil conspiracy (herein "Conspiracy") to commit and perpetuate a fraud[5], including but not limited to bankruptcy fraud, common law fraud, statutory fraud, tax fraud, accounting fraud (collectively the "Fraud"), acting by and through the knowing participation in the conspiracy of each Individual-Defendant to breach fiduciary duties owed, aiding and abetting the breach of fiduciary duty, and other commissions or omissions of Fraud, and through the creation and continued existence of a Conspiracy[6] to intentionally and with full knowledge of the fiduciary or special relationship burdening these Individual-Defendants' conduct, participate in concert, to aid and abet the Conspiracy as the control persons of the Entity-Defendants.  For the purpose of this Complaint, but not by way of limitation, Shumate, Pollard, Higgins, Kroesche, Miller, and Lopez included in the terms "Control-Defendants" or "Control Persons" over the "Entity-Defendants" and over the John Doe Entity-Defendants.

## II.
## JURISDICTION AND VENUE

36.     The United States Bankruptcy Court for the Western District of Texas (the "Court")

---

[3]     For clarity the members of the Conspiracy are the Individual Defendants.

[4]     For clarity, the instrumentalities of the Conspiracy are the "Entity Defendants.

[5]     As set out herein below fraud includes (i) denuding the Debtor of its assets and opportunities, (ii) using the Debtor or other Entity-Defendants for the improper benefit of one or more of the Individual-Defendants (alter ego); (iii) allowing one or more Entity-Defendants to wrongfully obtain assets and opportunities of the Debtor (reverse alter ego); (iv). Sham LLCs, (v) Common law fraud under the laws of the State of Texas; (v.) Bankruptcy fraud, including 18 U.S.C. §§ 151, 152, 157 and violation of the automatic stay 11 U.S.C. 362 and such other claims all as set out in this First Amended Complaint.

[6]     *See Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 138 Tex. 565, 160 S.W.2d 509, 514 (1942).

First Amended Complaint

has jurisdiction to consider this Motion under 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. § 157(b), and to the extent necessary, the Plaintiff consents to the Court entering a final order consistent with Article III of the United States Constitution.

37. Venue is proper under 28 U.S.C. §§ 1408 and 1409 as set out herein the Debtor is a Texas Limited Liability Company with at least one of its members being a Texas citizen, and the acts and conduct herein complained in part took place in the Western District of Texas.[7] Many of the Entity-Defendants are Texas Limited Liability Companies with at least one of its members being a Texas citizen. All Defendant Entities are owned by, held for, or operated for the benefit of the Control Persons.

38. The basis for the relief requested herein are sections 105(a), 361, 362, 363, 541, 544, 547, 548, 550, of the Bankruptcy Code; Rules 9014, 7065 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and Rules 4001, 9013-1, 9014 of the local rules of the Court (the "Bankruptcy Local Rules"), 18 U.S.C §§ 152-155; and 28 U.S.C. §2201 with respect to the request for Declaratory Relief herein.

### III.
### PRELIMINARY STATEMENT

#### A.    The Civil Conspiracy

39. The Individual-Defendants, led by Individual-Defendant Shumate ("Shumate") as the owner or control person of the Entity-Defendants, knowingly and intentionally combined to conceive by a meeting of their minds,[8] and jointly entered into a civil conspiracy (herein the

---

[7]    *See De Aguilar v. Boeing Co*., 47 F.3d 1404, 1413 (5th Cir. 1995) (*quoting Duncan v. Cessna Aircraft Co*., 665 S.W.2d 414, 421 (Tex. 1984)) ("[T]he law of the state with the most significant relationship to the particular substantive issue will be applied to resolve that issue.").

[8]    *Massey v. Armco Steel Co.,* 652 S.W.2d 932, 934 (Tex. 1983)

First Amended Complaint

"Conspiracy")[9] to accomplish a multi-year fraud by both unlawful means and by lawful means to obtain unlawful and illegal benefits, through their combination of fraudulent acts and omissions, and their conduct as the alter ego of the Entity-Defendants, designed to perpetuate the fraud upon the public generally and specifically creditors of the Plaintiff and the Entity-Defendants. The Individual-Defendants, through the actions of the Conspiracy, controlled the Entity-Defendants, and each Individual-Defendant was aware of the intended harm, or the proposed wrongful conduct to cause harm, at the outset of the combination and agreement to form and pursue the Conspiracy. The Individual-Defendants collectively and actively pursued the Conspiracy for their sole benefit and to the damage of CWS.[10] Plaintiff-Debtor alleges that the Individual-Defendants should be held personally liable under the corporate veil doctrine because the Entity-Defendants are each an alter ego of the Conspiracy and Shumate and the Individual-Defendants are, through the Conspiracy, operating a sham and committing fraud upon the public.[11]

40.    The Individual-Defendants caused the Conspiracy to convert, hide, destroy, and illegally use (or convert) more than $20 million in funds, assets, and opportunities, in addition to the going concern of CWS to strip CWS of all assets and all semblance of a business enterprise to prepare for its Chapter 7 filing as a "no asset" case, for the sole benefit of the Conspiracy.   The Conspiracy, and particularly Shumate, as the "control group" of the Plaintiff (pre-Chapter 7) and the Entity-Defendants, acted as an alter ego of the Entity-Defendants, which the Conspiracy used

---

[9]      *Agar Corporation, Inc. v. Electro Circuits International, LLC,* 580 S.W.3d 136, 141-142 (Tex. 2019).

[10]      *First United Pentecostal Church of Beaumont v. Parker*, 514 S.W.3d 214, 222 (Tex. 2017).

[11]      Because of the limited liability offered by corporations and limited liability companies, "a plaintiff seeking to impose individual liability on an owner must 'pierce the corporate veil.'" *Spring Street Partners-IV, L.P. v. Lam*, 730 F.3d 427, 443 (5th Cir. 2013) (applying Texas law); see also *In re Williams,* No. 09-52514, 2011 WL 240466, at *3 (Bankr. W.D. Tex. Jan. 24, 2011) (an LLC member may only be held liable for the LLC's breach of contract under traditional veil piercing laws). "Texas courts have applied the statutory veil piercing laws applicable to corporations to limited liability companies." *In re Williams*, 2011 WL 240466, at *3)

for its illegal purposes and as a sham to perpetuate a fraud by use of the corporate form as a shield from liability and disclosure, as part of an unfair device to achieve an inequitable result.[12]

41.     The fraud perpetuated by the Conspiracy included multiple acts of common law fraud, fraud, and defalcation while acting in a fiduciary capacity, bankruptcy fraud, tax fraud, accounting fraud, and spoliation of evidence, among other forms of illegal conduct.  As the direct and proximate cause resulting from the actions of the Conspiracy, CWS has been damaged in amounts in excess of $30 million in loss of operating assets, its accounts receivables, and its going concern value from the theft of all of its cash, accounts receivables, tangible and intangible assets, its employees, customers, vendor relations (including "wireline" MSAs[13]), and profits.[14]  The conspiring Individual-Defendants were fully aware of, and intended the harm or proposed wrongful conduct at the outset of their participation in the combination or agreement.[15]  The design and scheme of the Conspiracy was to use the corporate fiction for an illegitimate purpose, meaning actual or constructive fraud, a sham to perpetrate a fraud, and to launder money by false accounting, false records and multiple sham transactions by which the Conspiracy obtained funds and distributions without the burden of either "earning" the asset or funds, or paying taxes on the distributions disguised as business expenses, but paid ultimately to the members of the Conspiracy. Most importantly, as to Plaintiff, it was Plaintiff's funds, intentionally commingled with CES

---

[12]     *Rimade Ltd. v. Hubbard Enters.*, 388 F.3d 138, 143 (5th Cir. 2004);  *SSP Partners v. Gladstrong Investment (USA) Corp.*, 275 S.W.3d 444, 451-52 (Tex. 2008).
        The *Tex. Bus. Orgs. Code Ann.* § 21.223 - (b) Subsection (a)(2) does not prevent or limit the liability of a holder, beneficial owner, subscriber, or affiliate if the obligee demonstrates that the holder, beneficial owner, subscriber, or affiliate caused the corporation to be used for the purpose of perpetrating and did perpetrate an actual fraud on the obligee primarily for the direct personal benefit of the holder, beneficial owner, subscriber, or affiliate. (emphasis added).

[13]     Master Service Agreements that provided the authority and right of CWS to conduct business with clients.

[14]     *Tri v. J.T.T.*, 162 S.W.3d 552, 556 (Tex. 2005).

[15]     *Firestone Steel Prods. Co. v. Barajas*, 927 S.W.2d 608, 614 (Tex. 1996); *see also*, *Schlumberger Well Surveying Corp. v. Nortex Oil & Gas Corp.*, 435 S.W.2d 854, 857 (Tex. 1968).

funds, and then distributed to the Entity-Defendants or Affiliates, which were distributed by the Conspiracy to the conspirators' sole benefit.

### B. Civil Conspiracy Liability – Corporate Officer, Agents, and Professionals' Liability – Alter Ego Liability

42. To accomplish the illegal goals of the Conspiracy required the use and cover of the Entity-Defendants' actions and conduct, which liability is reflected by the *reverse* alter ego, *reverse* veil piercing of their "controlled" conduct.[16] Thus, in each of these occasions in which the Individual-Defendants were corporate officers, each such Individual-Defendant is personally liable for the commission and knowing participation in tortious or fraudulent acts even though the conduct occurred while the officer was acting as a control person on behalf of the Entity-Defendant.[17] Likewise, the Defendant-Entity itself became liable as the instrumentality of the Conspiracy and is liable for the acts it takes even under the control of the Conspiracy. *See, Id.* note. The Entity-Defendants, as agents, caused the entity to be used to perpetrate an actual fraud for the agent's direct personal benefit flowing to the benefit of the Conspiracy, serving as an alter ego of the Individual-Defendants and the Civil Conspiracy[18] and imposing liability on both the

---

[16] The claims and causes of action of "reverse piercing" holds a corporation liable for the controlling shareholder's debt even when it is the result of the Control Group that cause the injury. *See Chao v. Occupational Safety and Health Review Comm'n*, 401F.3d 355, 364-66 (5th Cir. 2005); *Zahra Spiritual Trust v. United States*, 910 F.2d 240, 243-44 (5th Cir. 1990); *Seghers v. Bizri*, 513 F. Supp. 2d 694 (N.D. Tex. 2007); *In re Boyd (Rodriguez v. Four Dominion Drive, LLC)*, 2012 WL 5199141 (Bankr. W.D. Tex. 2012); *In re Bass (Roberts v. J. Howard Bass & Assocs., Inc.)*, 2011 WL 560418 (Bankr. W.D. Tex. 2011); *In re Moore (Cadle Co. v. Brunswick Homes, LLC)*, 379 B.R. 284 (Bankr. N.D. Tex. 2007); *Wilson v. Davis*, 305 S.W.3d 57 (Tex. App.—Houston [1st Dist.] 2009, no pet.); *Hyde-Way, Inc. v. Davis*, 2009 WL 2462438 (Tex. App.—Ft. Worth 2009, pet. denied); *Valley Mech. Contractors, Inc. v. Gonzales*, 894 S.W.2d 832 (Tex. App.—Corpus Christi 1995, no pet.).

[17] *See, e.g., Gore v. Scotland Golf, Inc.*, 136 S.W.3d 26, 32 (Tex. App.—San Antonio 2003, pet. denied); *Kingston v. Helm*, 825 S.W.3d 755, 764-67 (Tex. App.—Corpus Christi 2002, pet. denied).

[18] *See In Bates Energy Oil & Gas v. Complete Oilfield Services*, 361 F. Supp. 3d 633 (W.D. Tex. 2019)*TecLogistics, Inc. v. Dresser-Rand Group, Inc.*, 527 S.W.3d 589 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *Hong v. Havey*, 551 S.W.3d 875 (Tex. App.—Houston [14th Dist.] 2018, no pet.); *R.P. Small Corp. v. Land Department, Inc.*, 505 F. Supp. 3d 681 (S.D. Tex. 2020).

First Amended Complaint

Individual Defendants and the respective Entity Defendants.

### C. The Nature of the Acts and Omissions of Fraud, Deceit and Deception:

43.    The Individual-Defendants' conduct and the alter ego conduct of the Entity-Defendants involved, at various stages and often repeated fraudulent conduct or fraudulent transfers among the Entity-Defendants (and third parties) involved in the actual fraud of the Conspiracy, including the following:

a.    Perpetrating and Perpetuating a fraud at Common law, including fraudulent non-disclosures and false representations.

b.    Perpetrating and Perpetuating a fraud by Statutory fraud Chapter 27, Texas Bus. & Comm Code § 27.01 *et seq*., fraud in Real Estate Transactions and fraud in the sale of stock.

c.    Perpetrating and Perpetuating a fraud by Defalcation while acting in a fiduciary capacity. *See*, 11 U.S.C. §523(a)(4).

d.    Perpetrating and Perpetuating a fraud by acts of Bankruptcy Fraud, including  (i)  the fraud described in 18 U.S.C.§ 151, *et seq*., (ii)  perjury and false oath in filings, and  (iii)  perjury and false oaths in Bankruptcy Court proceedings testimony.

e.    Perpetrating and Perpetuating a fraud by repeated acts of Fraudulent Transfers among the Entity-Defendants or the Individual Defendants, utilized to, among other fraudulent purposes and schemes:  (i)  to disguise distributions for the sole benefit of the Conspiracy and it co-conspirators;   (ii) to hide assets in and among the Entity-Defendants or Affiliates, or (iii)  to dispose of assets for less than their fair equivalent value; all intended to further the Conspiracy return to the co-conspirator member Individual-Defendants.

f.      Perpetrating and Perpetuating Tax fraud, both State and Federal.

g.      Perpetrating and Perpetuating fraud by accounting manipulations, false accounting entries, false State and Federal tax returns for the purpose of tax evasion, and intentional malice to injure the public and Plaintiff by manipulation, falsifying, and destruction of Plaintiff-Debtor's business records.

h.      Perpetrating and Perpetuating a Fraud by spoliation of physical and digital evidence, including destruction of Plaintiff-Debtor's business records that was then under the control of Bankruptcy Court orders and Bankruptcy Court subpoenas.

i.      Perpetrating and Perpetuating a Fraud by fraudulent transfers of CWS assets to various Entity-Defendants, Simmons Bank, and various other third-party transferees, and the Conspiracy's, and the Entity-Defendants' acting as the alter ego of the Conspiracy, to accomplish the theft of Plaintiff-Debtor's assets and opportunities, and the proceeds thereof.

j.      Perpetrating and Perpetuating a Fraud by treating the Entity-Defendants as an alter ego of the Conspiracy, and particularly Tom Shumate.

k.      Perpetrating and Perpetuating a Fraud by Commercial Confusion and Misrepresentation of Businesses and Business names, and Business Authority.[19]

## IV.
## THE NEED FOR CONTINUING EXTRAORDINARY INJUNCTIVE RELIEF

44.      This Complaint alleges an ongoing and complex civil Conspiracy operated for the

---

[19]      Including wrongful use of "Wireline Division" by CES when all wireline work was performed by an independent LLC, not a division;  by CES Group Holdings, LLC using the assumed name "Cinch Wireline" after Plaintiff's Chapter 7 case, an asset belonging to the Estate but in February 2024 the Sect of State of Texas was falsely instructed the Plaintiff Cinch Wireline Services, LLC consented to the use of its name "Cinch Wireline" by CESGH. In both instances the customers and vendors of Plaintiff were not informed of Plaintiff's Chapter 7 case and were both told and led to believe that the Debtor was an active and ongoing business after December 13, 2023, the Petition Date.

purpose of defrauding the public by denuding and bankrupting the Debtor through a scheme of alter ego affiliated Entity-Defendant companies and accounting and asset manipulations designed to promote only the interests of the Individual-Defendants at the expense of Plaintiff and its assets and opportunities (including Plaintiff's claims against the Entity-Defendants) and its or their respective creditors. This civil conspiracy dates to at least 2020 and involves fraud occurring prior to the voluntary Chapter 7 case-filing and illegal pre-filing transfers, and, importantly, the actual fraud after the Petition Date of December 13, 2023.

45.     Although the allegations of the Conspiracy's pre-petition conduct involve, likely, more than $50 million in fraudulent funds theft and transfers to the Insiders, *it is the post-petition conduct of the Individual-Defendant-members of this civil Conspiracy that immediately threatens the Trustee's ability to protect the Estate and the creditors' recoveries* from this Estate through the Conspiracy's conduct to physically destroy and spoil the Plaintiff-Debtor's (and other affiliated parties') business books and records, and to remove, hide, or transfer (including by sale) assets from the possession and ownership of the Plaintiff-Debtor, including millions of dollars in valuable equipment, tools, vehicles, and business records and even the Debtor's exclusive use of its own name. The purpose of the ongoing Emergency injunctive relief sought by this Complaint deals with this actual and ongoing destruction, burning, and burying of literally thousands of pages of written records belonging to the Debtor, by direction of Shumate and other Individual-Defendants and the participation of all the Individual-Defendants, and the actual destruction of digital business records and documents by the Conspiracy.

46.     The Debtor's counsel prepared schedules and statements of affairs (all signed and verified by Tim Pollard, a witness that has only recently taken the Fifth Amendment defense in refusing to answer any questions about the Debtor) and amended over the signature of Thomas

Shumate, alleging that the Debtor *has no assets,* or as amended, only four oilfield wireline trucks. This is in stark contrast to the evidence presented to this Court of more than $25 million of equipment (vehicles, rolling stock, and oilfield wireline equipment) that the Plaintiff purchased and was utilizing only days before the filing of the "no-asset" Chapter 7 voluntary Petition. It has since been discovered that much of this $25 million in assets was transferred from the Plaintiff-Debtor, at or just before the closing of the MainStreet Loan, to Individual-Defendant CES which was then pledged to the Simmons to Collateralize the MainStreet Loan as part of Simmons' loan requirements. That is, Plaintiff-Debtor transferred (and thereby lost) ownership of $25 million in equipment in exchange for payment of $6.7 million in debt secured by the equipment (a net loss of $18.3 million), leaving the Plaintiff-Debtor an operating shell without assets and grossly undercapitalized. As noted herein, Texas law treats this transaction one of two ways – a fraudulent transfer to a subsequent transferee (Summit) with full knowledge of the fraud, or a transfer giving rise to a "resulting trust" (the "Resulting Trust") [20] that keeps superior title with the Plaintiff-Debtor. In either event, the demands and liens of Summit are void, or at best subordinate to the rights of Plaintiff-Debtor.

47.  Thus, the CES-Summit pledged equipment is property of the estate of Plaintiff-Debtor whether the subject of the actual fraudulent transfer or the Resulting Trust.

---

[20]  **11 U.S. Code § 541 - Property of the estate**
    (a) The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
        (1) Except as provided in subsections (b) and (c)(2) of this section, *all legal or equitable interests of the debtor in property as of the commencement of the case*. (Emphasis Added).
….
A *resulting trust arises by operation of law* when title is conveyed to one party, but the purchase price is paid by another. *Crume v. Smith,* 620 S.W.2d 212, 215 (Tex. Civ. App. - Tyler 1981, no writ). The parties who have paid the purchase money are equitable owners of the property, and the titleholder is a mere trustee who holds for the benefit of those that furnished the consideration. *Masterson v. Hogue*, 842 S.W.2d 696, 697 (Tex. App. 1992). Any purchaser or lender with notice of the facts giving rise to a resulting trust takes subject to the superior title held by the beneficiary of the resulting trust.

First Amended Complaint

48.     The evidence adduced during the Preliminary Injunction resulting in the Court issuance of an Initial Preliminary Injunction and thereafter an Agreed Preliminary Injunction, and the evidence to be adduced in further the hearings on a Preliminary Injunction relief unquestionably shows the pre-and continuing post-petition fraudulent Conspiracy of the Control-Defendants and the Individual-Defendants named in this Adversary Proceeding brought by the Trustee involve the assets of the Entity Defendants.  The post-petition fraud in this case is massive, fully illustrates the use of these alter ego entities of Tom Shumate, and includes but is not limited to the following:

   a.     On the eve of the Petition Date, the Debtor owned millions of dollars in assets, equipment, tools, employees, records, telephone numbers, email web addresses and names, and miscellaneous items, including hard copies of business records, used exclusively in the "wireline business" conducted *only by CWS* as an operating company under the name "Cinch Wireline Services".  Contrary to the false schedules and statements filed in the CWS voluntary Chapter 7 case, the Debtor was generating and continued to generate substantial income yet has never reported any of these facts to the Trustee or the bankruptcy court.  Instead, the Individual-Defendants controlling the Entity-Defendants, acting in concert, filed the "no-asset" Chapter 7 case, reported no operating business, yet illegally and unlawfully continued the Plaintiff-Debtor's business operation purportedly under a newly formed limited liability company owned by Shumate, "CES Group Holdings, LLC".  Instead of truthful reporting to the Trustee, the Conspiracy of Individual-Defendants and their lawyers, acting as the Control-Defendants, cause the Entity-Defendants (CES and CESGH, among others) to lock-out the Trustee from the physical locations of Plaintiff-Debtors' Corpus Christi yard and office, refuse to produce any

business records, and begin a campaign to actually burn, hide, and destroy the physical and digital business records of the Debtor to cover up this and likely many other fraudulent activities. This conduct occurred both pre-petition and post-petition and constituted bankruptcy fraud under 18 U.S.C. §§ 151, *et. seq*., as well as significant damages to the Plaintiff

      b.      Effective as of the Petition Date, Tim Pollard signed and caused to be filed in this bankruptcy case, and under penalty of perjury, false schedules of creditors and statements of affairs of the Debtor (the "Schedules and Statements"), and thereafter falsely testified under oath at several §341 Meeting of Creditors that the Debtor had no assets and was not operating. By these false swearing and testimony of Tim Pollard *during this bankruptcy case*, Tim Pollard waived any Fifth Amendment privilege from later testifying in this bankruptcy case about those topics.

      c.      From the Petition Date to February 24, 2024, Defendants, with full knowledge of: (i) the bankruptcy; (ii) the false schedules and statements; and (iii) the secret (and unreported) continuing business activities of the Debtor Wireline, acting in concert, obtained the benefits of the Debtor's secret operations including the profits and cash proceeds produced and paid professional fees,[21] but reported nothing to the Trustee.

---

[21]     Although the Debtor's operations may not have been a secret to the oil and gas industry and the vendors they services, those operations were knowingly kept secret from the Trustee and his counsel by a concerted conspiracy of sworn denials that this Debtor CWS had no assets, and effort to: (i) to avoid service of subpoenas; (ii) with actual notice of the bankruptcy and the subpoenas, to refuse to honor the subpoenas issued by the Trustee to produce documents; (iii) to lock out the Trustee from the facilities containing the business records; (iv) to move all Debtor's equipment from its locations on the Petition Date so as to hide and secret the new location and their continued use; (v) to convert all Debtor's digital storage and computers and attempt to wipe the hard drives of all evidence regarding the Debtor's business and assets; and (vi) after knowledge of the subpoenas and the bankruptcy case pending, literally dig a hole, deposit the business records, burn business records of the Debtor, and backfill the hole (this intentional concerted fraudulent conduct was secret for more than 120 days and designed to, and in fact did, deprive the Trustee of the information necessary to protect the Estate, its assets and its earnings); and (vii) upon learning of this fraudulent conduct and spoliations, and the debtor obtaining multiple injunctive order prohibiting all such further conduct, the Conspiracy continued to violate the injunctions before this Court and others.

First Amended Complaint

d.     On February 24, 2024 Defendants, with full knowledge of: (i) the bankruptcy; (ii) the false schedules and statements; (iii) the false testimony of Pollard;  (iv) the continuing secret business activities of the Debtor's business Cinch Wireline, acting in concert, filed with the Secretary of the State of Texas ("TX-SOS") *consent on behalf of the Debtor*[22] to allow the newly formed and owned [by Tom Shumate[23]] Texas limited liability company CESGH[24] to use the assumed name "***Cinch Wireline***" so that CESGH could that same day record with the SOS an "assumed name" certificate for "Cinch Wireline" as owned by CESGH[25] and thereby continue the operations of the Debtor's wireline business under that assumed name (and by converting the debtor business name and good will to CESGH to benefit exclusively the Conspiracy).  The theft, post-petition, of the Plaintiff-Debtor's business name was done by the Conspiracy so that the public would not know of the bankruptcy filing when CESGH continued to solicit, perform, and bill for work as "Cinch Wireline".

e.     Thereafter, CESGH has operated as if it owned the Debtor's ("Cinch Wireline's") ongoing business enterprise consisting of millions of dollars in assets and equipment, employees, vendors, Master Service Agreements, and its goodwill.  It is undisputed that this ongoing operation, that existed on the Petition Date and continues

---

[22]     *See*, **Exhibit "22"** attached hereto – consent to use of the name "Cinch Wireline" granted by Cinch Wireline Services, LLC post-petition, and secretly done to allow the Midland operations to continue by CESGH using "Cinch Wireline" logo-marked equipment, billing under the invoice name and logo of Cinch Wireline and making demands on vendors and customers "as if" the Cinch Wireline they had dealt with for years was still operating.

[23]     On information and belief the actual forms and filings of the assumed name with the SOS were accomplished by the CPA firm that was fully aware of the pending Cinch Wireline Chapter 7 bankruptcy and knew that taking of the business name "Cinch Wireline" was improper and was being done to allow Shumate, Pollard, and other Individual-Defendants to syphon off the cash flow of the Debtor's operations by using CESGH as a conduit for the fraud.

[24]     *See*, **Exhibit "23"** CESGH SOS filing to form the new LLC, CESGH.

[25]     *See*, **Exhibit "24"** CESGH SOS filing of assumed name certificate for "Cinch Wireline."

First Amended Complaint

through this filing, was the Debtor's exclusive operation, simply because neither Cinch Energy Services, LLC nor any of the other Defendants or affiliates of these Defendants, have ever operated a wireline business.

f.      Likewise, CESGH *as a new LLC* could not have previously owned and operated the Debtor's business.  CESGH simply held itself out in the Oil and Gas Service Company Section as "Cinch Wireline" "as if" it was the Debtor (because it was the Debtor's employees, equipment, logo-marked equipment, and Debtor operations in disguise), so that CESGH and the Conspiracy could continue to obtain the cash flow and benefits of the Conspiracy's operations and hide that fact from the customers and from the bankruptcy Trustee and Court by filing false schedules, giving false § 341 Creditors' Meeting testimony (Pollard, Shumate, and Kroseche) and false filings in the bankruptcy case.  To cover the records of post-petition events and pre-petition conduct, the Conspiracy proceed to burn thousands of pages of business records and erase almost all data from its mainframe storage devices and lap top storage hard drives.

g.      Neither CESGH, the Conspiracy, nor any of the Individual-Defendants have ever voluntarily disclosed their secret and fraudulent operations of the Debtor's business, and to the contrary, acted in concert and through the Conspiracy to fraudulently conceal the Conspiracy's conduct and fraud. *See, e.g*. Note 16, *infra*.  In fact, as noted by the US Trustee in its Motion to Convert the recently filed WFO, LLC Chapter 11 case, that Conspiracy Alter Ego had "… *$23 million in 2023 and $112,816.53 for January 1, 2024, to May 6, 2024,* and entered … "[26] yet WFO entered Chapter 11 with almost no assets and minimal cash.  What happened to the assets and going concern - "Schedule G discloses a

---

[26]      *See*, US Trustee's Motion to Convert, pg.3 ¶8.

First Amended Complaint

lease with *Lone Star Cement, LLC ("LSC"), another entity owned or controlled by Shumate …(and):*

> Kroesche testified that LSC has been using the Debtor's cement plant since January 2024. In addition to the cement plant, LSC has been using the Debtor's equipment and customers for several months prior to the bankruptcy filing (and) *that LSC, without paying any consideration to the Debtor, used the Debtor's valuable assets and has likely taken millions of dollars of potential income during 2024. See,* Trustee's Motion to Convert WFO, pg. 3,4 9 (Emphasis added.)

h.     Notwithstanding this Court's injunctive relief granted to the Plaintiff upon hearing the Conspiracy's fraudulent scheme to use CWS's entire business for free, during that same time the Conspiracy duplicated the CWS business theft, and in both cases have illegally and fraudulently taken the proceeds for the benefit of the Conspiracy. This scheme has put into the hands of the Conspiracy, post-filing of Cinch Wireline Services, LLC's Chapter 7, millions of dollars, none of which has been accounted to the Trustee or this Court. Although no separate records have yet been produced by CESGH, the Midland operations appear to be using the CES bank accounts and the following discloses what is occurring with that account:

| Transfers To Shumate Entities Since Bankruptcy 12/13/23 | | Filed On TRO Entered on 4/11/24 |
|---|---|---|
| **Date** | **Account Transferred to** | **Amount** |
| **Cinch Energy Services LLC - 768408** | | |
| 1/26/24 | Cinch Energy Deposit | $32,000.00 |
| 2/1/24 | Susser Bank - Check #76716 - Cinch Investment Holdings | $28,401.68 |
| 2/15/24 | FTSJR Holdings | $70,000.00 |
| 2/15/24 | CES Operating | $3,454.00 |
| 2/21/24 | Wireline Operating | $1,700.00 |
| 2/22/24 | FTSJR Holdings Shortage LH | $25.00 |
| 2/26/24 | Cinch Investment Holdings | $252.00 |

| | | |
|---|---|---|
| 2/28/24 | CES Operating | $1,380.00 |
| 2/29/24 | FTSJR Holdings | $17,500.00 |
| 2/29/24 | CES Operating | $105.42 |
| 4/1/24 | Cinch Energy Deposit | $110.00 |
| 4/1/24 | Wireline Operating | $50.00 |
| 4/1/24 | CES Operating | $25.00 |
| 4/1/24 | FTSJR Holdings | $125.00 |
| 4/1/24 | CES Operating | $50.00 |
| 4/2/24 | Hook N Bull LOC | $7,300.00 |
| 4/3/24 | CES Operating | $2,320.00 |
| 4/5/24 | Hook N Bull LOC | $8,625.00 |
| 4/5/24 | CES Operating | $7,000.00 |
| 4/5/24 | Cinch Investment Holdings | $25,000.00 |
| 4/5/24 | Hook N Bull LOC | $165,000.00 |
| 4/10/24 | CES Operating | $2,000.00 |
| 4/11/24 | 2nd Lien RLOC Hook N Bull | $15,870.00 |
| 4/15/24 | Texas Coast Builders | $4,250.00 |
| 4/16/24 | CES Operating | $925.00 |
| 4/19/24 | Texas Coast Builders | $38,100.00 |
| 4/23/24 | Hook N Bull LOC | $17,400.00 |
| 4/23/24 | Withdrawal - Loan Payment Hook N Bull 1041270 - RLOC2 | $12.24 |
| 4/24/24 | Cinch Investment Holdings | $75,000.00 |
| 4/24/24 | CES Operating | $195.00 |
| 4/26/24 | Hook N Bull LOC | $60,100.00 |
| 4/26/24 | Hook N Bull LOC | $900.00 |
| 4/29/24 | Hook N Bull LOC | $600.00 |
| 4/30/24 | CES Operating | $6,900.00 |
| 5/2/24 | 2nd Lien RLOC Hook N Bull | $52,700.00 |
| 5/7/24 | Cinch Energy Deposit | $45,000.00 |
| 5/8/24 | Cinch Energy Deposit | $50,200.00 |
| 5/9/24 | 2nd Lien RLOC Hook N Bull | $7,200.00 |
| 5/10/24 | 2nd Lien RLOC Hook N Bull | $21,965.00 |
| 5/13/24 | 2nd Lien RLOC Hook N Bull | $10,120.00 |
| 5/14/24 | Cinch Energy Deposit | $37,500.00 |
| 5/16/24 | 2nd Lien RLOC Hook N Bull | $14,978.00 |
| 5/20/24 | Cinch Energy Deposit | $10,000.00 |

First Amended Complaint

| 5/21/24 | CES Operating | $10,266.00 |
| 5/24/24 | 2nd Lien RLOC Hook N Bull | $51,675.00 |
| 5/29/24 | CES Operating | $35,621.00 |
| 5/30/24 | Texas Coast Builders | $67,835.00 |
| | **TOTAL** | **$1,007,735.34** |

From the CES bank statements (recall that CES operations have been shut down) it appears that the earnings of the Midland Operation in continuing the Plaintiff-Debtors business appears to show that since the Petition Date CES bank records indicate that transfers from that account total $1,007,735.34 just through May 30, 2004. These funds from this single source account (believed to be the Midland Operations) belong to the Plaintiff-Debtor's estate in this Chapter 7 bankruptcy case but have been mis-directed by the Conspiracy for multiple Entity-Defendants use.

      i.      In addition to the monumental fraud, during this same period the Conspiracy, *and by ignoring this Court's Injunction Orders and order of the District Court*, SD TX (J. Hanks), have sold, transferred, and used property and assets to defraud Plaintiff-Debtor and Entity-Defendant creditors (of which, Plaintiff-Debtor is one of the largest) of the proceeds and the assets, including:

           i.    CHI's (owned by Shumate and operated by the Conspiracy) asset the Karnes County Mansion, valued at $2.5 million and distribution of the proceeds to the Conspiracy;

          ii.    The Superior Ready Mix of Texas, LLC and WFO, LLC assets to Lone Star Cement, for no consideration, allowing Lone Star Cement (owned by Shumate and operated by the Conspiracy) to collect all revenues from the business operation and distribute those revenues to the Conspiracy.

iii.   CHI has, on May 29, 2024, borrowed $500,000.00, and pledged the Agua Dulce Ranch as collateral on a Second Lien Deed of Trust from an individual Eugene H. Bouligny.

None of these more recent transactions have been reported in any manner to this Court. Without the continued and additional emergency relief granted by this Court prohibiting the sale and disposition of funds of the Entity-Defendants, the Conspiracy will continue to dispose of assets, hide, secret or spend the proceeds for the sole benefit of Shumate and the Conspiracy. Without the additional relief sought for the violation of those orders and the denuding of the Entity-Defendants' estates (each of which, as a result of being the alter ego of the Conspiracy, are indebted to the Plaintiff-Entities), the Plaintiff-Debtor's Estate will be rendered valueless and the ability to recover from these the Entity-Defendants the funding furnished to each and all of them, and to recover from the Individual-Defendants the actual and exemplary damages proximately caused by the fraud of the Conspiracy unlikely and the ability to reconstruct the years of fraudulent conduct will be impeded to a point that may not allow such reconstruction and payment of this just and due debt.

## IV.
## RELEVANT BACKGROUND FACTS

### A.    Introduction – the Civil Conspiracy and the Conspirators:

49.    Shumate is the mastermind of the Conspiracy and the elaborate fraud scheme designed to utilize the Plaintiff-Debtor as the Conspiracy's alter ego to denude and bankrupt the Plaintiff-Debtor, then to use the Plaintiff-Debtor's business assets, employees, cash, accounts receivables for its own and sole benefit. However, Shumate as only a high school graduate, required professional help to accomplish this fraud, defalcations, and breach of duties described in

this Complaint. He obtained those professional services primarily through the following individuals:

a. **Higgins**, a CPA (and a purported PHD[27]) maintained total control of the accounting systems which conveniently never used "audit trail" accounting software (and frequently the only original books of record consisted of spreadsheets) use to prepare and file false financial records, false federal income tax returns, and otherwise manipulate and misrepresent that nature of many claimed "expenses" or "disbursements" for the purpose of tax evasion and tax fraud, and then upon discovery of a subpoena for those records, directed the burning of those records and the erasing of the digital copies of those records.

b. **Pollard**, an oil and gas experienced mid-lever manager, followed the direction and instructions of the Conspiracy and (himself under indictment for federal FICA tax fraud). As an example, Pollard was the manager in charge of taking all of the employees, equipment, vendors, customers books and records necessary to secretly run the Midland Office under the purportedly new LLC "CESGH" but using the assumed name "Cinch Wireline". Although Pollard's indictment is only for failure to pay FICA 940 and 941 taxes, he has taken the Fifth Amendment and refused to testify in this Court about any of his activities yet remains in full control and management of the Entity-Defendants, the Conspiracy's alter egos.

c. **Kroesche**, a business advisor to Shumate and the Conspiracy, without any business or other degree, and a joint-assist to Higgins with her activities, Kroesche , and along with Higgins, planned and incorporated many of the Entity-Defendants among which funds, assets, and

---

[27] Although not disclosed in Higgins web page or public publications, on information and belief the degree was awarded through an unaccredited college and on information and belief owned in whole or in part by Higgins, as a Christian seminary degree from Barnham Graduate School and Seminary College (according to Higgins Linkedin Page). https://www.linkedin.com/in/lorettahigginscpa

opportunities were swapped by the Conspiracy schemes without any business record to document

these transfer (e.g. no leases, no bill of sale, no sale contract, no promissory notes, or other business

records to reflect when assets were taken, sold, or converted for the benefit of the Conspiracy) and

for the frequent purpose of hiding funds and assets from creditors, but more often, to funnel tax-free

funds to Shumate (and the other co-conspirators) to support Shumate's opulent life style of private air

planes (owned by Cinch Energy, but paid for by CWS), exotic cars, multiple mansions, at least two

yachts, and on information and belief, monthly living and personal travel expenses of approximately

$250,000.00.

        d.      There are other members of the Conspiracy that have played a lesser role, but that

are active in the Conspiracy fraud scheme, including the hiding and fake-sale of Plaintiff-Debtor's

assets to be held for the Conspiracy. Upon information and belief, Jerry Miller was an active

participant in this part of the Conspiracy's fraud.

## B.      The Conspiracy's Scheme to Defraud

        50.      The scheme to commit and perpetuate fraud involved the creation of numerous corporate

entities (usually taking the LLC form) including the Entity-Defendants controlled by Shumate with the

assistance, aid and abetting of the other Individual-Defendants. However, most of the entities were

incorporated to hold assets that Shumate wanted to acquire tax-free and have the use (e.g. Ranches, Cars,

Airplanes, Yachts …). Thus, most of the ranches, paid for by the Plaintiff as illustrated below, were held in

separate entities, and were funded in whole or in significant party by Plaintiff. The same for Shumate's several

large homes owned at the time of the CWS Chapter 7 voluntary petition, and the same for the yachts,

payments for which were taken (in whole or in part) from Plaintiff-Debtor. *See* Exhibits attached hereto and

discussed below.

        51.      Thus, Shumate needed access to cash and devised the "Deposit Account" Scheme to allow

the free taking and transferring of funds from the two profitable operating oil and gas companies (CES and CWS). In fact, Plaintiff-Debtor was the most profitable operation of the Entity-Defendants, with CES producing approximately 35% of the jointly held accounts receivables (the "Deposit Account" full described herein; *See*, ¶56 and chart). Both Kroesche and Higgins lied about the profit-earning of CWS and CES, claiming that Plaintiff-Debtor never earned a profit and that the profits were all from CES. This false testimony is easily shown from the fact that when the Conspiracy decided to shut down CES and CWS pre-petition of the CWS Chapter 7 filing, the Conspiracy elected to only continue the business of CWS under the disguise of CESGH. Obviously, the Conspiracy would not select the unprofitable CWS to continue its business if CES was the only profitable operation. The true reason for the false testimony is that CWS was the most profitable operation and had funded almost every Entity Defendant from time to time, with (on information and belief) the false entries for tax purposes indicating that this funding was a deductible expense of operations. (*See,* multiple exhibits attached hereto).

52. First, the Organizational Chart below illustrates the various Entities-Defendants used by Shumate and the Individual-Defendants to carry out their fraudulent scheme and activities designed to drain cash, assets, and opportunities from the Plaintiff-Debtor's estate for the personal benefit of the Conspiracy and ultimately of Shumate and the Individual-Defendants:

First Amended Complaint



Second, because few of the Entity-Defendants above were operating entities or profitable operations they required funds to be regularly contributions of cash to pay the debt and operating expenses of the non-operating or non-income producing Entity-Defendants. The primary operating companies were Plaintiff CWS and its affiliate CES. Thus, the job of the Conspiracy was to continue the operations of the profitable companies to allow the Conspiracy to funnel "non-taxed"[28] cash to the non-operating Entity-Defendants to pay for the ranches, planes, homes, yachts, and to Shumate personally). The Conspiracy created a system of comingled funds from the main operating entities "Deposit Account" that has allowed the Conspiracy to manipulate the business assets and records, tax returns, and distribute before-tax earnings to accomplish the frauds and breach of duties complained of herein.

### C.   The Conspiracies' Scheme Was a Regular, Repeated Illegal Practice:

---

[28]     "Non-taxed" cash means the gross receipts of CES and CWS as co-mingled funds kept in the Charter Bank Deposit Account and frequently transferred to other Entity-Defendants or to Shumate directly. The Deposit Account did also pay operating debt of CWS and CES, as well as the Simmons Bank MainStreet Loan (70% of all such payments were made from CWS funds from a CWS account).

First Amended Complaint

53. An illuminative example of the fraud derivative of the "Deposit Account" scheme (into which *all Plaintiff's and CES's before-tax accounts receivables were deposited*) gave Shumate and the Conspiracy direct access to the gross income of CES and CWS, which the Conspiracy accessed in the millions regularly for use by the Conspiracy in its own self-interest, and in violation of the fiduciary duties owed by the Individual-Defendants to Plaintiff.

54. Most of these funds transferred were booked "as if" a business "deductible expenses" of CWS and CES, when they were in truth distributions for the benefit of the Conspiracy. The Deposit Account also funded the Conspiracy's wrongful pledge of Plaintiff's assets to Simmons Bank, all which assets were acquired with Plaintiff's funds but recorded on the books or certificates of title in CES's name in order to close the illegal Simmons Bank loan. [*See, infra* Note 20 for Plaintiff's claim of a "Resulting Trust"].

55. The following Chart depicts the co-mingling system of CES and CWS gross proceeds and the "Deposit Account", the majority of which (over 65%) were funds earned by the Plaintiff CWS:



56. Circles #s 1 and 2 illustrate the vendor "Invoices" from CES and CWS for service work.

Circle # 3 is the factoring bank Crestmark lock box into which all CES and CWS A/Rs were deposited. Once Crestmark deducted its earned advances, fees, and interest, the funds remaining were deposited *at Charter Bank into the "Deposit Account (circle #4).* Only the Conspiracy had access to the Deposit Account. This Chart illustrates one of the manners that the Conspiracy would distribute co-mingled funds from the Deposit Account to CES (Circle #5) and CWS (Circle #6), to allow the two entities to pay their share of the monthly Simmons Bank loan payment (Circle #7). Many other examples involving the Entity Defendants receiving Deposit Account funds are discussed below, involving the direct funding *not through CWS*, but of CWS's 65% share of the Deposit Account. These direct payments from the Deposit Account to the other Entity-Defendants were directed by the Conspiracy, not Plaintiff-Debtor.

57. As the above chart illustrates, Simmons Bank's monthly payment was paid each month (except one) in the following shared percentages: **CES 35% and CWS 65%** [*See, Infra* Chart of Simmons Bank payments by CWS ¶60 and Chart]. This percentage distribution also matched the Spreadsheet of appraised value prepared by CWS at the time of the MainStreet Loan collateral appraisal was undertaken by Simmons Bank's independent appraiser. (*See*, CES **Exhibit 21** admitted in the Preliminary Inj. Hearings) This percentage split approximated the Conspiracy's understanding of the ownership of the Collateral to be valued and pledged to Simmons (being $26 million of CWS assets and $7 million of CES assets – and fit the Simmons Bank's independent appraisers' analysis of values of the two entities assets (*See*, *Id.* CES **Exhibit**).[29]

---

[29] This percentage split is in stark contrast to the position now taken by the Conspiracy – that even though CWS earned at least 65% of all Deposit Account funds which was the source of the funds used to acquire all of CWS's wireline assets value in excess of $25 million, because title was transferred to CES to comply with the Simmons Bank MainStreet Loan requirements and the book entries by Higgins were made showing that the assets acquired were all CES-owned assets. Thus, CWS operations for the seven years prior to the MainStreet Loan now reflected it acquired no assets. When CWS filed Chapter 7, the schedules and Statements reflect that CES had no assets. This statement was false in that CES had substantial assets separate from the assets CES acquired to fund the MainStreet Loan, and there was no disclosure of the transfer of these assets only 23 months prior to the Plaintiff-Debtor's voluntary Chapter 7 petition, This is the best example of documented fraud – in particular bankruptcy fraud.

First Amended Complaint

58.      Importantly, in order to conclude the MainStreet Loan with Simmons Bank's predecessor in January 2022 (23 months before the Plaintiff-Debtor's Petition Date), Simmons Bank and CES agreed to transfer all title to Wireline equipment in the name of CWS *to the CES* so that CES could pledge the CWS Collateral to secure the MainStreet Loan, thereby leaving CWS insolvent.  In addition, the lender negotiating the MainStreet Loan demanded that CWS (now without title to its assets) guaranty the MainStreet Loan for more than $20 million, in order to have its secured debt on its assets transferred to CES in the amount of $6.7 million paid by the MainStreet Loan funding.   This requirement was not only done to clear the CWS secured debt on its $25 million of assets,  but to give CES sufficient collateral to meet regulatory requirement for the MainStreet Loan.  By design, CES and the lender arranged to take all CWS's collateral in order to close a loan that only paid off CWS's secured debt of  $6.7 million but took all of its $25 million in equipment as collateral the Conspiracy gave CES (the named borrower CES) who then received all net proceeds from the loan and disbursed those proceeds according to the Conspiracy's illegal use, primarily to the benefit of Shumate.

59.      Now currently pending before this Court is the Plaintiff's Motion to Enforce the Automatic Stay regarding Simmons Bank's efforts to collect its multi-million-dollar government guaranteed "Mainstreet Loan" borrowed only by CES [Accounts #s 1, 4, and 5] *but claiming in a non-bankruptcy court all assets in which CWS's asserts it owns or has an interest.*    Simmons claims that Plaintiff-Debtor's interest is not "property of the estate" notwithstanding Plaintiff-Debtor's notice of claims.   Because of the impact of what this Chart depicts, CWS claims that as to the MainStreet Loan, only one of two events occurred as a matter of law:

   a.   CWS retained at least equitable title in its assets transferred without consideration or at lease grossly inadequate consideration, and hold superior equitable title because of the actual fraud and the "resulting trust" that arises from paying the purchase price of property titled in

another's name);  or

    b.   Simmons Bank was the bad faith subsequent transferee of the fraudulent conveyance of Plaintiff-Debtor's assets with full knowledge of the insolvency of CWS caused by tis loan terms.

The MainStreet Loan was negotiated by Kroesche[30] and guaranteed by Shumate and Lopez, all three members of the Conspiracy.  The chart below reflects the payments made on the Simmons MainStreet Loan and shows that CES paid 35% of the Simmons monthly note payment and *CWS paid 65% of the Simmons monthly note payment*:[31]

---

[30]      Kroesche appears to have been the lead "negotiator" on the MainStreet Loan which was negotiated "as if" the Plaintiff-Debtor did not exist; that is, although more than 65% of all collateral required to qualify for the MainStreet Loan was wireline equipment (not CES Pipeline equipment) acquired by Plaintiff-Debtor from its own funds either in the Deposit Account or from the CWS operating account.  Negotiations with the MainStreet Loan lender included statutory-required appraisals done on the equipment, most all marked "Cinch Wireline Services, LLC" – but CWS not the borrower primarily because to break the loans into two entities greatly reduced the amount of available funds.  To obtain the most funds, the assets owned by CWS were treated as assets owned by CES and wrongfully pledged on the MainStreet Loan.  The Conspiracy saw to it that Kroesche was well-compensated for this slide-of-hand (known also by the bankers negotiating the loan) services of approximately $175,000.00 – from Plaintiff's funds.  *See*, **Exhibit 30** attached hereto.

[31]      Even though CWS, Plaintiffs, earnings were in-fact greater than 65% the Conspiracy selected this number.  And when questioned about earnings, Kroesche testified that "… CWS never made any money" and that CES had to pay the debts of CWS. That testimony was false, and Kroesche knew it was false.  He negotiated the MainStreet Loan and because funds could only be disbursed to a single entity meeting the statutory criteria, it was decided that CES would be listed as the owner of all of CWS's assets.   It was purely an accounting fiction that all of the Deposit Account was for the benefit of CES.  In fact, this arrangement created a "Resulting Trust" in favor of the Plaintiff CWS.  [*See*, Note 24, supra].

First Amended Complaint

**SIMMONS BANK - MAIN STREET LOAN PAYMENTS**
**ACCOUNT # 15700000270032**

| DATE | AMOUNT | PAYEE | ACCOUNT DRAWN FROM | CHECK # | PAGE |
|------|--------|-------|--------------------|---------|------|
| 1/13/2022 | $ 31,069.17 | SPIRIT OF TEXAS BANK | CHARTER BANK - WL #801217 | 9093 | 17 |
| 1/13/2022 | $ 31,069.17 | SPIRIT OF TEXAS BANK | CHARTER BANK - CES #768408 | 67155 | 20 |
| 2/15/2022 | $ 50,976.54 | SPIRIT OF TEXAS BANK | CHARTER BANK - WL #801217 | 9099 | 17 |
| 2/15/2022 | $ 10,976.54 | SPIRIT OF TEXAS BANK | CHARTER BANK - CES #768408 | 67863 | 42 |
| 3/10/2022 | $ 37,442.66 | SPIRIT OF TEXAS BANK | CHARTER BANK - WL #801217 | 14563 | 19 |
| 3/10/2022 | $ 18,721.34 | SPIRIT OF TEXAS BANK | CHARTER BANK - CES #768408 | 67986 | 26 |
| 4/11/2022 | $ 41,474.29 | SIMMONS BANK | CHARTER BANK - WL #801217 | 15678 | 41 |
| 4/11/2022 | $ 24,235.80 | SIMMONS BANK | CHARTER BANK - CES #768408 | 64239 | 19 |
| 5/11/2022 | $ 42,343.97 | SIMMONS BANK | CHARTER BANK - WL #801217 | 14587 | 18 |
| 5/11/2022 | $ 24,743.49 | SIMMONS BANK | CHARTER BANK - CES #768408 | 68713 | 24 |
| 6/10/2022 | $ 49,088.53 | SIMMONS BANK | CHARTER BANK - WL #801217 | 14600 | 21 |
| 6/10/2022 | $ 27,324.66 | SIMMONS BANK | CHARTER BANK - CES #768408 | 69384 | 37 |
| 7/8/2022 | $ 51,696.72 | SIMMONS BANK | CHARTER BANK - WL #801217 | 15954 | 18 |
| 7/8/2022 | $ 28,776.48 | SIMMONS BANK | CHARTER BANK - CES #768408 | 69756 | 35 |
| 8/9/2022 | $ 61,090.07 | SIMMONS BANK | CHARTER BANK - WL #835355 | 20052 | 31 |
| 8/9/2022 | $ 34,005.21 | SIMMONS BANK | CHARTER BANK - CES #768408 | 70261 | 43 |

| DATE | AMOUNT | PAYEE | ACCOUNT DRAWN FROM | CHECK # | PAGE |
|------|--------|-------|--------------------|---------|------|
| 10/10/2022 | $ 69,723.16 | SIMMONS BANK | CHARTER BANK - WL #835355 | 20424 | 24 |
| 10/10/2022 | $ 38,810.73 | SIMMONS BANK | CHARTER BANK - CES #768408 | 70573 | 22 |
| 11/10/2022 | $ 78,398.61 | SIMMONS BANK | CHARTER BANK - WL #835355 | 20854 | 20 |
| 11/10/2022 | $ 43,639.84 | SIMMONS BANK | CHARTER BANK - CES #768408 | 71112 | 22 |
| 12/12/2022 | $ 82,222.39 | SIMMONS BANK | CHARTER BANK - WL #835355 | 20872 | 23 |
| 12/12/2022 | $ 45,768.30 | SIMMONS BANK | CHARTER BANK - CES #768408 | 71968 | 46 |
| 1/9/2023 | $ 89,443.91 | SIMMONS BANK | CHARTER BANK - WL #835355 | 20881 | 24 |
| 1/9/2023 | $ 49,788.09 | SIMMONS BANK | CHARTER BANK - CES #768408 | 71997 | 24 |
| 2/10/2023 | $ 89,951.43 | SIMMONS BANK | CHARTER BANK - WL #835355 | 21954 | 24 |
| 2/10/2023 | $ 50,070.61 | SIMMONS BANK | CHARTER BANK - CES #768408 | 72427 | 22 |
| 3/13/2023 | $ 82,894.52 | SIMMONS BANK | CHARTER BANK - WL #835355 | 21965 | 23 |
| 3/13/2023 | $ 46,142.44 | SIMMONS BANK | CHARTER BANK - CES #768408 | 72886 | 25 |
| 4/17/2023 | $ 92,774.91 | SIMMONS BANK | CHARTER BANK - WL #835355 | 21978 | 21 |
| 4/17/2023 | $ 51,642.27 | SIMMONS BANK | CHARTER BANK - CES #768408 | 72918 | 21 |

60.     Not only did the Conspiracy obtain the ownership and benefit of $20+ million in CWS wireline equipment (without consideration) to collateralize the MainStreet Loan from which only CES (and other affiliates) obtained the major benefit and actually flowed to the Conspiracy, but also required Plaintiff-Debtor to guaranty the loan and a repayment commitment of 65% of the _loan from CWS operations_. Simmons knows that

      a.   CES  acquired the vast majority of the title to its Collateral without consideration;

      b.   CES (not CWS) as borrower, was paid the vast majority of the MainStreet funds \

      c.   CWS was required to be liable for repayment of the entire MainStreet Loan;  and

      d.   CWS _paid 65% of every loan payment_.

Yet Simmons Bank claims CWS has no interest in the Collateral argues in its Response that CWS has no

legal or equitable interest in these assets as property of the CWS Estate. *See, e.g.* Note 26, *supra*, and references to a "resulting trust" in favor of CWS.

61.      As the Simmons Bank loan illustrates, by use of this Deposit Account, the Conspiracy could manipulate not only the distributions as it wanted from CWS funds, but also the evasion of taxes on transfers of these funds out of the entities earning the funds and without either entity paying taxes on this fraudulent transfer.   The evasion of taxes and the recording accounting of transactions out of the Deposit Account, was Higgins responsibility.   The accounting for tax deduction purposes as false expenses were in fact distributions to the Individual-Defendants (primarily Shumate), is illustrated below.

**D.      Illustrations of the Conspiracy's Alter Ego Use and Control of the Entity-Defendants to Benefit only the Conspiracy:**

62.      The Conspiracy's self-dealing illustrated by the MainStreet Loan has been repeated literally multiple of times, as discussed in this Complaint and involving total control of the Entity-Defendants by the Conspiracy as an alter ego of each such Conspiracy.   At all times relevant to this Complaint the Conspiracy acted as an alter ego of each Entity-Defendant, using the Plaintiff's Debtor's funds or its assets, or making transfers of its property without consideration or for far less than fair market value in order to hide and secret the asset being held ultimately for the Conspiracy.

63.      Each of the Entity-Defendants participated in the Conspiracy as an alter ego of the Conspiracy, receiving funds from the Plaintiff CWS usually from the Deposit Account, paying debts for the entity that inured directly to the benefit of the Conspiracy and the co-conspirators. Below is a description of only a portion of what is believed to be the illegal and improper use of Deposit Account funds by each of the Entity-Defendants at the control of the Conspiracy, and almost always to the injury of Plaintiff CWS.  Plaintiff claims an equitable interest in those funds and assets acquired with those funds as well as claims for actual and punitive damages against the Conspiracy and certain of the Entity-Defendants discussed below.

First Amended Complaint

### i.    CWS / <u>CES Deposit Account Funds</u> – the Fraud of CESGH and the Conspiracy

64.     The Deposit Account, along with related accounts and assets obtained by and through the use of those funds, was the regular "Piggy Bank" of the Conspiracy.  At any time that the Conspiracy wanted to acquire an asset for the benefit of the Conspiracy or one or more of its co-conspirators, or a draw of funds from the Deposit Account to improve unrelated assets or to distribute the funds tax-free to Shumate and other co-conspirators, it did so even though such use or the assets acquired had nothing to do with the business of Plaintiff CWS or its affiliate CES.   Although each Entity Defendant was controlled by the Conspiracy, it seldom caused the business records to reflect the truth of the transactions – there were no promissory notes prepared, no leases for transferred property, no repayment scheme for the funds taken, and often the funds were taken by one Entity-Defendant only for the purpose of distribution ultimately to Shumate.   Likewise, the accounting often reflected manipulated assets and tax depreciation that did not reflect the true transactions. The accounting either ignored or manipulated the $6.7 million payoff of Plaintiff-Debtor's secured lending in order to have its assets pledged as collateral on the CES – Simmons MainStreet Loan.   *See*, **Exhibit 32**, attached hereto showing the CWS secured lenders that were paid off by the MainStreet Loan only after CWS transferred $25 million in equipment.  That Collateral is currently pledged to Simmons Bank, claiming a lien on those assets owned by Plaintiff-CWS and for which CWS got a negative $18.3 million dollar benefit – or put differently, that CWS lost $18.3 million in the loan transaction.

65.     To illustrate by examples of the use of the Deposit Account as the "Piggy Bank" of Shumate and the Conspiracy, the following assets, acquired to support Shumate's luxurious lifestyle, were supported almost exclusively by the Deposit Account or the Plaintiff-Debtor's Operating Account funds, notwithstanding that none of the assets were necessary or related to the business operations of the CWS wireline business:

a.  **The Shumate Airplane**.

Shumate initially purchased the airplane in July 2018 however the Conspiracy always caused the note securing the purchase to be paid from the Deposit Account Charter Bank #7868406 partially as follows:

| FTS Airplane Loan Expenses | | | | |
|---|---|---|---|---|
| Expense | Date | Description | Payment | Bank Account |
| $2,238.00 | 6/13/2018 | First Financial Bank - Ch#7718 6/13/18 | Loan Payment | Charter CES - #768408 |
| $3,879.72 | 8/29/2018 | First Financial Bank - Ck *7839 8/29/18 | Loan Payment | Charter CES - #768408 |
| $3,879.72 | 8/30/2018 | First Financial Bank - ACH 08/30/18 | Loan Payment | Charter CES - #768408 |
| $5,563.85 | 10/9/2018 | First Financial Bank - Chk 7895 10/09/18 | Loan Payment | Charter CES - #768408 |
| $3,879.72 | 10/17/2018 | First Financial Bank Loan Payment 10/17/18 | Loan Payment | Charter CES - #768408 |
| $5,859.54 | 10/19/2018 | First Financial Bank 10/19/18 | Loan Payment | Charter CES - #768408 |
| $5,859.54 | 11/14/2018 | First Financial Bank 11/14/18 | Loan Payment | Charter CES - #768408 |
| $3,879.72 | 11/17/2018 | First Financial Bank 11/17/18 | Loan Payment | Charter CES - #768408 |
| $5,859.54 | 12/14/2018 | First Financial Bank 12/14/18 | Loan Payment | Charter CES - #768408 |
| $3,879.72 | 12/17/2018 | First Financial Bank 12/17/18 | Loan Payment | Charter CES - #768408 |
| $700.00 | 12/28/2018 | First Financial Bank - Ck*7986 12/28/18 | Loan Payment | Charter CES - #768408 |
| $116,871.12 | 12/31/2019 | First Financial Bank Plane Payments for 2019 | Loan Payment | Charter CES - #768408 |
| $116,871.12 | 12/30/2020 | First Financial Bank Plane Payments for 2020 | Loan Payment | Charter CES - #768408 & Allegiance CES - #41988 |
| $89,653.34 | 9/30/2021 | First Financial Bank Plane Payments (Jan - Paid off in Sept) | Loan Payment | Charter CES - #768408 |
| **$368,874.65** | **TOTAL** | | | |

In addition to making airplane mortgage payments, the Plaintiff-Debtor's funds were used to pay operating and maintenance expenses from Deposit Account funds.

| FTS Airplane Maintenance Expenses | | | | |
|---|---|---|---|---|
| Expense | Date | Description | Payment | Bank Account |
| $25,949.59 | 10/10/2018 | Advantage Aircraft Services *4608 10/10 | Maintenance | Charter CES - #768408 |
| $4,518.83 | 1/30/2019 | Advantage Aircraft *1/30/19 | Maintenance | Charter CES - #768408 |
| $100,000.00 | 3/30/2021 | Advantage Aircraft Services - wired from deposit account | Engine Repair | Charter CES Deposit - #785618 |
| $6,668.31 | 5/4/2021 | Advantage Aircraft Services - check #1152T | Engine Repair | Charter CES - #768408 |
| $25,705.00 | 5/12/2021 | New First Insurors Aviation Binder *ACH CES Charter | Insurance | Charter CES - #768408 |
| $100,000.00 | 9/27/2021 | Blackhawk Aviation *wire from deposit account | Engine Replace | Charter CES Deposit - #785618 |
| **$262,841.73** | **TOTAL** | | | |

And, in further addition to Plaintiff's funds in the Deposit Account paying for the airplane debt service and maintenance, in November 11, 2021 the Conspiracy caused CES to purchase the airplane from Shumate for $2,290,926.00 of Deposit Account funds (*which was used to pay off the initial purchase loan, with the remaining balance, on information and belief, paid to Shumate even though he paid nothing from personal funds for the airplane*). Even after *CES* owned the airplane all payments continued to be made *from the Deposit Account*, approximately 65% of which were funds of the Plaintiff-Debtor, yet Plaintiff-Debtor had no record ownership of the airplane, nor did it obtain any of

First Amended Complaint

the benefits of such ownership:

**Deposit Account Payments By CES from the Deposit Account**

| Cinch Airplane Expenses | | | | |
|---|---|---|---|---|
| Expense | Date | Description | Payment | Bank Account |
| $20,655.88 | 1/28/2022 | Domestic Aircraft Financing *wire from CWS Charter | Loan Payment | Charter CWS - #801217 |
| $20,000.00 | 2/16/2022 | Domestic Aircraft Financing *wire from CES Charter | Loan Payment | Charter CES - #768408 |
| $19,672.27 | 3/22/2022 | Domestic Aircraft Financing *wire from CES Charter | Loan Payment | Charter CES - #768408 |
| $177,051.33 | 12/31/2022 | 1st Source Bank Plane Payments (April - Dec) | Loan Payment | Charter CES - #768408 |
| $59,017.11 | 3/14/2023 | 1st Source Bank Plane Payments (Jan - Mar) | Loan Payment | Charter CES - #768408 |
| $9,836.14 | 4/19/2023 | 1st Source Bank Plane Payment | Loan Payment | Charter CES - #768408 |
| $9,836.14 | 4/19/2023 | 1st Source Bank Plane Payment | Loan Payment | Charter CWS - #835355 |
| $316,068.87 | TOTAL | | | |

and even though Shumate used the airplane almost exclusively for his personal non-business use, he never reimbursed CES or CWS for such personal use by Shumate or his friends.  [*See*, also **Exhibit 25**, examples of Deposit Account Checks paying for the airplane].  As to personal use, *See*, **Exhibit 26** attached hereto as a true copy of the flight reflecting use of the airplane since the filing of the CWS Chapter 7 bankruptcy, showing frequent travel to non-business locations such as Aspen, Colorado and Cancun, Mexico.  On information and belief, none of this personal use was ever repaid by Shumate and no income has been recorded in the records of deposits to the Deposit Account for use of the airplane by others.  Plaintiff-Debtor claims a legal or equitable interest in those funds and assets acquired with those funds.

b.      **The Shumate Sarasota, Fl. Mansion Paid by the "Deposit Account"**

Shumate used debtor funds and the commingled Deposit Account to pay his monthly house loan payment to Bank of Washington. Shumate also paid the property taxes from the debtor account. Shumate's house in Florida is valued at $5,300,800.00 per the Sarasota County Appraiser.   From December 31, 2017, to March 31, 2023, payments just for the mortgage debt totaled *$1,376,316.78.*  In addition, the Plaintiff-Debtor paid from the CWS operating

account the ad valorem taxes on the property annually in excess of $50,000.00  *See*, **Exhibit 27** attached hereto.  Debtor claims a legal or equitable interest in those funds and assets acquired with those funds.

**c.      The Shumate Stable of Collector or Exotic Vehicles**:

Shumate used Deposit Account and Plaintiff-Debtor funds to pay for his exotic vehicles.[32] As an example, *See*, **Exhibit 28** listing payments to Ferrari Financial.  Debtor claims a legal or equitable interest in those funds and assets acquired with those funds.

**d.      The Shumate Fleet of Yachts**.

Shumate used Deposit Account and Plaintiff-Debtor funds to make Yacht debt payments and maintenance payments.   Some of these payments reflect funds wired by CIH, the holding company with no income – on information and belief CIH simply received funds from the Deposit Account and Plaintiff-Debtor account and made these payments at the direction of the Conspiracy.  *See*, **Exhibit 29** listing examples of payments for the three (3) Yachts "Patron" "Boss" "Bitch" and Costa Rica maintenance services.  *See*, **Exhibit 29** listing payments discovered thus far, and note the deposit slip indicates payment from CIH, while the actual deposited check is drawn on the "Deposit Account" or the Plaintiff-Debtors operating account.

66.      However, the most illustrative of the fraud schemes involves the CWS bankruptcy planning and the manipulation of the business records to defraud Plaintiff.   The business records reflect that although CWS purchased more than $25 million of oilfield wireline equipment, all of that wireline equipment was

---

[32]      On information and belief, Shumate owns the following collector or exotic automobiles:
Porsche 911 Turbo Sl. Ferrari Sports car;  Lamborghini Urus;  Maserati Gran Turismo;  Audi R8;
Bentley Continental GTC; Aston Martin Vantage;  Chevrolet Corvette Z06;  1957 Chevrolet
BelAir;  Ford F350 Platinum;  Ford F250 Lariat; Ford Raptor.

First Amended Complaint

falsely accounted for "as if" CES was the buyer and owner when in fact CES simply took title from CWS, without consideration paid to CWS for $18.3 million of the equipment it took.[33] Thus, when CWS was faced with a possible multi-million judgment (and after its Deposit Account was substantially given to other affiliated Entity-Defendants to satisfy the needs of the Conspiracy), the Conspiracy falsely claimed to have "shut down operations" *of both CES and CWS*.    To avoid the participation in the State Court suit brought against Shumate and the Conspiracy, CES, and CWS, and believing that the automatic stay would protect its fraud from the State Court inquiries, the Conspiracy fraudulently filed a Chapter 7 for CWS swearing under penalty of perjury by both Shumate and Pollard *that CWS had no assets*, never disclosing the January 2022 transaction by which CES obtained all of the equipment of CWS so that it could close the MainStreet Loan. CWS was hiding this transfer which was required to have been reported at least in the statement of affairs.

67.    The fraud and manipulation of these assets did not stop there. Without any disclosure of the truth and the pre-bankruptcy planning and transfers of Plaintiff's assets that totally denuded CWS of its $25 million in assets, all those assets next were "claimed" to be owned by a newly named Entity-Defendant, CES Group Holdings LLC so that all continued business activity of Plaintiff-Debtor was simply moved to Midland, *to continue the business of CWS under the "assumed name "Cinch Wireline"*.  No transfer documents exist – no bill of sale – no promissory note – nothing documents in writing what CESGH has done.  Through the design of the Conspiracy, the new entity Shumate-owned CESGH secretly claimed it now owned the $25 million of assets, equipment, employees, vendor contracts, MSAs, web presence, telephone numbers, employees, all and everything previously owned on the day before the Petition Date by Plaintiff-Debtor.  This secret and massive theft of the entire "going concern" business of the Plaintiff-Debtor (and of what CES claimed it owned and pledged to Simmons Bank), servicing the same customers of the Plaintiff-Debtor, using the same assets, employees, web presence, telephone numbers, and existing pre-petition accounts receivables,

---

[33]    *See*, Note 25.  Under Texas law when such a scheme is done in fact the legal title holder is subordinate to the equitable title of the person or entity that paid the fund and maintained the assets by its use.

generated millions of dollars in revenue before the Trustee was able to determine what had occurred and understand the fraud of the "no asset" case filing. The Trustee has now discovered that not only had the assets and going business been stolen in 2022, but on the petition date those stolen assets used by the Plaintiff-Debtor up to the Petition Date, were now being used by CESGH, and the Conspiracy was collecting all pre-petition and post-petition accounts receivables but not paying the Simmons Bank secured debt against those assets, such that the gross revenue and cash flow, free from debt reduction, were syphoned off by the Conspiracy for its own use and benefit.

68.     Accordingly, this Bankruptcy Fraud involves more than $25 million of stolen fraudulently transferred assets, as well as the value of the stolen opportunities and value of the Plaintiff-Debtor intangible going concern and good will, all having been stolen by CESGH *in contemplation of the CWS bankruptcy.* On information and belief, the undisclosed post-petition operations of the Plaintiff-Debtor's business have generated as much as  five million in revenues or more (which revenue has been, on information and belief, distributed to members of the Conspiracy, and their lawyers) without ever voluntarily reporting *any of these events to the Trustee or the Bankruptcy Court*, even when the Conspiracy members were ordered to disclose, report, and produce documents they refused. In fact, the Conspiracy lied about the status of the CWS-Debtor's assets, claiming that initially CWS had no assets, and later by Shumate, claiming that there were four (4) trucks titled in the name of CWS.

69.     As to CES, its pipeline assets and its funds have disappeared (just as CWS assets were secretly taken), and notwithstanding that *CES owes CWS millions for the equipment that CWS purchased with its share of the co-mingled funds or its Operating Account funds,* and which CES took title or recorded on its accounting book a claim to the ownership, the Conspiracy now says CES is out of business. There is no disclosure where the CES assets have gone

70.     Finally, the debt and recovery of the CES wireline assets taken and remaining are held in a

Resulting Trust (as a matter of law) and are due to CWS as the beneficiary of such Resulting Trust, for which judgment is sought jointly and severally against CES, the (i) Conspiracy of Individual Defendants, and upon a declaration of this Court (ii) as to any such third parties, including Simmons Bank, claiming a right to a lien or possession of those Resulting Trust assets.

a. **BL Equity Holdings, LLC:**

71. "BLEH" has been involved in the Conspiracy in numerous aspects through its owner and co-conspirator Kroseche. BLEH was a recipient of a fraudulent transfer of real estate in Kenedy County, Texas (acquired with Debtor funds and commingled funds paid for this real estate) sold to it by Drakefire Management, LLC and Hook N Bull Properties, LLC for no consideration. Although BLEH paid no consideration for this transfer, it then transferred the property to William H Holdings, LLC, on information and belief, for no consideration or less than adequate consideration for the transfer. William H Holdings, LLC (WHH) is affiliated with Jerry Miller, an owner of WHH, and a co-conspiratory and an Individual-Defendant in this Complaint. Attached hereto as **Exhibit 1** is the November 3 Deed reflecting this fraudulent transfer. The Plaintiff-Debtor's Deposit Account or Operating Account funds have been used to purchase or support the BL Equity Holdings, LLC or William H Holdings, LLC claims and accordingly, Plaintiff-Debtor claims a legal or equitable interests therein.

72. BL Equity Holdings, LLC is an alter ego of the Conspiracy. WHH appears to be holding property belonging to Plaintiff CWS and to the extent it is, WHH is also an alter ego of the Conspiracy,

ii. **Cinch Energy Services, LLC** ("CES")

In addition to the use of the funds from the commingled Deposit Account for its own self-interest as directed by the Conspiracy, CES transferred assets that belonged to Debtor for use as collateral for the MainStreet Loan now owned by Simmons Bank. CES conspired through the control of the Conspiracy to improperly and illegally apply its Employee Retention Credit Refund ("ERC") due both CES *and CWS*. The

funds were deposited into the CES-Simmons Bank account and then transferred to the Cinch Investment Holdings ("CIH") Charter Bank Account which was a non-operating Shumate owned LLC. This transfer to the Conspiracy through the alter ego Entity-Defendant CIH, by the control of the Conspiracy, violated all the regulations regarding proper use of an ERC Refund, illustrated by the Charter Bank and Simmons Bank Statements. *See*, **Exhibit 2** attached hereto. Upon information and belief, Shumate received most of these funds at the direction of the Conspiracy, either directly or indirectly as payments on assets within the exclusive possession and control of Shumate. The Plaintiff-Debtor's Deposit Account or Operating Account funds have been used to purchase or support the CES and CIH assets or claims and accordingly, Plaintiff-Debtor claims a legal or equitable interests therein to those assets and funds.

73.      CES is an alter ego of the Conspiracy.

### iii.      Cinch Investment Holdings, LLC

CIH is a non-operating entity earning no revenues and incurring only debt. Accordingly, CIH had to be funded by others. Accordingly, CIH received, at the direction of the Conspiracy, debtor funds from the Deposit Account or Plaintiff-Debtor's operating account, to purchase real estate and mineral interest in Karnes County, Texas, none of which was recorded in the Plaintiff-Debtor's name. CIH also received and used Deposit Account funds (Plaintiff-Debtor funds) to purchase equipment and pay for improvements to this real estate. Plaintiff-Debtor funds were also used by CIH to purchase millions of dollars of exotic animals for the Karnes ranch operation. CIH also used Plaintiff-Debtor funds to acquire the "Karnes County Mansion" located in Karnes County. After the Petition Date of Plaintiff-CWS's bankruptcy, the Conspiracy negotiated a sale of the Karnes County Mansion and 10 acres of real estate to 17 Main, LLC for less than 50% of its fair market value. The Conspiracy received those funds   Additionally, CIH received the cash proceeds of the sale of real estate held in CIH name but paid for with Plaintiff-debtor funds.   On information and belief, the Conspiracy received and distributed the gross proceeds realized from this sale. CIH also received funds from

the sale of real estate held in CES's name. This real estate was paid with Plaintiff-Debtor funds and was located near Premont, TX in Jim Wells County. These transactions are reflected by the cancelled checks and accounting attached hereto as **Exhibit 3**. Finally, only recently CIH participated in the granting of a second lien on the Agua Dulce ranch for $500,000.00 which funds, on information and belief, have been taken by the Conspiracy. The Plaintiff-Debtor's Deposit Account or Operating Account funds have been used to purchase or support the CIH assets or claims and accordingly, Plaintiff-Debtor claims a legal or equitable interests therein.

74.     Entity-Defendant CIH is an alter ego of the Conspiracy.

**iv.     CES Group Holdings, LLC** ("CESGH") is a sham entity in possession of Plaintiff-Debtor's assets and ongoing wireline business discussed above and more fully below, as well as the responsible Entity-Defendant for the distributions of millions of dollars *post-petition from these operations at the direction of, and for the sole benefit of, the Conspiracy*. CESGH paid nothing for the assets of the Plaintiff-Debtor and upon the Trustee discovering what CESGH and the Conspiracy has done and obtaining Preliminary Injunction relief, CESGH has acted to impede the Trustee, violate the bankruptcy law, court orders, and the court's rules, to keep the details of the operations a financial secret until all possible cash flow could be stolen. On information and belief, millions of dollars have been taken from the results of the Midland Operation. The Plaintiff-Debtor's Deposit Account or Operating Account funds have been used to purchase or support the CES assets or claims and accordingly, Plaintiff-Debtor claims a legal or equitable interests therein.

75.     Entity-Defendant CESGH is an alter ego of the Conspiracy.

**v.     Capital Property Investing, LLC** ("CPI")

76.      CPI was a recipient of multiple fraudulent real estate transfers from three different entities, Cinch Energy Services, LLC, Superior Ready Mix of Texas, LLC and WFO, LLC, each of which entities

were acquired with funds belonging to the Plaintiff either from the Deposit Account or more recently the Midland Operation, to acquire or other maintain these properties. *See*, **Exhibit 4** attached hereto.

77. Entity-Defendant CPI is an alter ego of the Conspiracy.

**vi. Chattington Investments, LLC** ("Chattington")

78. Chattington obtained a portion of the Employee Retention Credit funds and illegally used those Funds of approximately $73,086.30 to purchase real estate in Bexar County, Texas either in the name of Entity-Defendant Chattington or another strawman entity. *See*, **Exhibit 5** attached hereto.

79. Entity-Defendant Chattington is an alter ego of the Conspiracy.

**vii. Drakefire Management, LLC, Trustee** ("Drakefire")

80. Drakefire was one of recipients for the Kenedy County property that was transferred multiple times without consideration paid. Shumate executed the Special Warranty Deed to Drakefire, Trustee for the Momento Mori Trust Dated September 30, 2023. Drakefire then conveyed this real estate to an entity owned by Kroesche, BL Equity Holdings, LLC., without consideration paid, as part of a fraudulent scheme to disguise the fraudulent transfer of this property. The monthly payments on this property were made from the Deposit Account even though these assets had nothing to do with the wireline business of Plaintiff. *See*, **Exhibit 6**, the Special Warranty Deeds of this transaction attached hereto.

81. Entity-Defendant Drakefire, in aiding and abetting Shumate, Kroseche, and BL Equity Holdings, LLC, is an alter ego of the Conspiracy.

**viii. Edmund Home Builders, LLC** ("EHB")

82. EHB was the recipient of Deposit Account funds but performed no services nor rendered any benefit to Plaintiff-Debtor or CES. The transfer, on information and belief, was to benefit assets of entities

controlled by the Conspiracy including CIH and Hook N Bull, LLC. *See*, **Exhibit 7** attached hereto

83. Entity-Defendant EHB, in aiding and abetting Shumate, Kroseche and the Conspiracy, is an alter ego of the Conspiracy.

### ix. **FTS Ranch, LLC** ("FTSR")

84. FTSR received commingled debtor funds to pay for the loan on this real estate located in Karnes County, Texas. Plaintiff-Debtor funds and commingled debtor funds were used to make improvements to the property and to purchase millions of dollars of exotic animals that were released on the property. Plaintiff had no business interest in the property yet did not even have a promissory note reflecting the millions of dollars taken to support this "playground" for Shumate and the Conspiracy. *See*, **Exhibit 8** attached hereto illustrating only some of the Deposit Account used to support the FTS Ranch.

85. Entity-Defendant FTSR is an alter ego of the Conspiracy.

### x. **FTSJR Holdings, LLC** ("FTSJR"):

86. FTSJR was a shell company owned by Shumate that has no operations. On information and belief, the recipient of commingled Deposit Account debtor funds that have been funneled thru Superior Ready Mix of Texas, LLC and Chattington Investments, LLC to FTSJR, and likely then to Shumate. *See*, **Exhibit 33**. The Chart which is assumed to be from the deposit of operations at the Midland Yard, FTSJR has received over $100,000.00 in transfer to its account. *See, Infra* ¶**48(h) pg. 23**. All post-petition earnings from the Midland Yard a funds belonging to Plaintiff-Debtor.

87. Entity-Defendant FTSR is an alter ego of the Conspiracy.

### xi. **Grander Holdings, LLC ("Grander")**

88. Grander used both debtor funds and commingled debtor funds to pay for yachts used by Shumate, expenditures having no business purpose except to expand the "playground" of Shumate and the Conspiracy. An example of only a few of the many, many transactions in which Plaintiff funded Yacht

secured debt or expenses are attached to **Exhibit 9**.

89.     Entity-Defendant Grander Holdings, LLC is an alter ego of the Conspiracy.

xii.     **Hook N Bull Properties, LLC** ("HNB")

90.     HNB has been involved in numerous transactions involving the taking of the Plaintiff-Debtor's funds or the Deposit Account funds.   One example is listed above involves the tract of land in Kenedy County that was paid for by Plaintiff-Debtor funds. This parcel in Kenedy was then fraudulently transferred to BL Equity Holdings, LLC then sold to William H Holdings, LLC.  The far more expensive series of transactions involve the used the Plaintiff-Debtor's funds to pay the debt service on the Karnes County ranch property and for improvements on the property, none of which had any benefit to the Plaintiff nor was it a related business expense. *See*, **Exhibit 10** attached hereto for the accounting documents for these two series of payments utilizing Plaintiff's funds.

91.     Entity-Defendant Hook N Bull Properties, LLC is an alter ego of the Conspiracy.

xiii.     **Los Cabos Ranch, LLC** ("LCR")

92.     LCR's involvement with the Plaintiff-Debtor's funds is through the Deposit Account. LCR obtained funds from the commingled Deposit Account to acquire two parcels of property in Victoria County, Texas.  LCR also used funds and equipment from the commingled Deposit Account to improve the real estate, acquire equipment for the property and purchase livestock and animals for the property.   The wrongful and illegal use of these funds exceeds $1 million.   Attached hereto as **Exhibit 11** are accountings for the Deposit Accounts funds discovered to date used by LCR with no business purpose or benefit to the Plaintiff.

93.     Entity-Defendant Los Cabos Ranch, LLC is an alter ego of the Conspiracy.

xiv.     **17 Main, LLC** ("17Main")

94.     17Main acquired a parcel of property from Cinch Investment Holdings, LLC (~~CHI~~ CIH) in Karnes County, Texas.  Plaintiff-Debtor's funds were used to purchase this real estate and the Plaintiff-Debtor

Page 47

has at least equitable interest in, of not title to, the property. The property included the "Karnes City Mansion" a 32,000 sq. ft. home on 10 acres of land. Unknown to the Plaintiff-Debtor, after the Petition Date a sale was arranged by Shumate acting on behalf of CIH for approximately $775,000.00. On information and belief, the parties all knew of the bankruptcy case, and in any event knew that the purchase price was less than 50% of the fair market value of the property. The sale constituted an actual or constructive fraudulent transfer, made at a time when CIH, a non-operating entity, was insolvent or by the sale was rendered insolvent. The Plaintiff has not yet determined the true relationship of the parties to determine whether the fraud involved in this case is actual or constructive. Attached hereto is **Exhibit 12** General Warranty Deed to 17 Main, LLC showing that the Buyer is using the same "mailing address149 Motts Parkway, Marion, Tx 78124" as Shumate's business address. In keeping with the Conspiracy's schemes to defraud Plaintiff and creditors, the funds from this sale have been secreted or spent by the Conspiracy.

95. Plaintiff does not allege, at this time, that 17 Main is an alter ego of the Conspiracy but does allege that, based on the purchase price and issues involving the true relationship of the parties, the transaction constitutes a fraudulent transfer and was not entered into in good faith without notice by the parties of facts and events that give rise to a fraudulent transaction.

### xv. Lone Star Cement Company, LLC ("LSCC")

96. LSCC is in the possession of, and is using the assets of, WFO and Superior Ready Mix of Texas, LLC. Just as the Midland Operation was arranged by the Conspiracy to possess and utilize the Plaintiffs assets and business for no consideration, LSCC has been using cost free all the operating assets of WFO and, on information and belief, Superior Ready Mix, LLC. Both Superior Ready Mix, LLC and WFO received funds from the Deposit Account to initiate their respective business ventures and on information and belief, both have received substantial sums of money from the Midland Operations utilizing the Plaintiffs assets and ongoing business. On information and belief, LSCC may have received portions of those funds.

Just as the Midland operations, prior to the Superior Ready Mix of Texas, LLC's and WFO, LLC's Chapter 11 bankruptcy filing, through the Conspiracy's illegal and fraudulent pre-bankruptcy planning, Lone Star Cement, LLC was transferred the use of the personal property assets of both entities, real estate lease interests of WFO, the phone numbers of WFO's business operations, and the customer base of WFO. Plaintiff has claims against both transferees and accordingly against LSCC for these fraudulent transfers and bankruptcy fraud. *See*, **Exhibits** attached relevant to Superior Ready Mix, LLC and WFO.

97.　　Entity-Defendant Lone Star Cement Co. is an alter ego of the Conspiracy.

**xvi.　Ocean Floor Holdings, LLC** ("OFH")

98.　　The Shumate-owned Entity-Defendant OFH holds two homes that were fraudulently transferred from Shumate to avoid loss through the collection of a judgment in multiple cases pending against Shumate in State Court. These homes were acquired using funds from the Deposit Account along with paying property taxes from funds from the Deposit Account and on information and belief these properties are held in a sham transaction for the benefit of Shumate and the Conspiracy. *See*, **Exhibit 13** attached hereto.

99.　　Entity-Defendant Ocean Floor Holdings, LLC is an alter ego of the Conspiracy

**xvii.　Ponder Ranch, LLC ("Ponder")**

100.　　Ponder holds mineral interests it received from the Cinch Investment Holdings, LLC real estate (the "Agua Dulce Ranch") purchases in Karnes County. After acquisition of the Agua Dulce Ranch, Shumate transferred the mineral interest to this entity that was once held by attorney Paul Kirklin. Shumate then instructed Paul Kirklin to transfer membership interest to Shumate. At present the Trustee is unsure of the ownership of these mineral interests. On information and belief, all these transactions were without consideration and transferred to hide the assets from judgment creditors and now the Plaintiff. The Debtor's Deposit Account or Operating Account funds have been used to purchase and support the Agua Dulce Ranch

and accordingly, Plaintiff-Debtor claims equitable interests therein. [*See*, **Exhibit 14** attached hereto and *See* examples for CIH, **Exhibit 3**].

101.　Entity-Defendant Ponder Ranch, LLC is an alter ego of the Conspiracy.

### xviii.　Superior Ready Mix of Texas, LLC ("SRMT")[34]

102.　SMRT was transferred funds from the Deposit Account to initially start the business and thereafter, additional funds have been advanced, on information and belief, to purchase assets of SMRT. On information and belief SMRT has received, directly or indirectly, fund from the Midland Operations to pay Chapter 11 expenses including adequate protection payments and attorney's fees. Plaintiff claims an equitable interest in those funds and assets acquired with those funds. *See*, **Exhibit 15** attached hereto.

103.　Entity-Defendant Superior Ready Mix of Texas, LLC is an alter ego of the Conspiracy.

### xix.　Superior Ready Mix, LLC ("SRM")

104.　SRM was a recipient of funds from the commingled Deposit Account advanced for no business purpose of Plaintiff-Debtor and for the sole purpose to benefit the Conspiracy. Examples of such transfers are set out on **Exhibit 16** attached hereto. Plaintiff claims an equitable interest in those funds and assets acquired with those funds.

105.　Entity-Defendant Superior Ready Mix, LLC is an alter ego of the Conspiracy.

### xx.　Tim Pollard Construction, Inc. ("TPCI")

106.　TPCI, owned by Individual-Defendant and co-conspirator Tim Pollard, received hundreds of thousands of dollars from the Plaintiff-Debtor's operating checking account for alleged services at the Karnes Mansion, Agua Dulce Ranch, and for Ranch Labor. The Plaintiff-Debtor had no financial interest in any of these properties and such expenditures were not related to any reasonable business expense of the Debtor, but only to benefit Shumate and the Conspiracy, which

---

[34]　As noted earlier, because Superior Ready Mix of Texas, LLC is in its own Chapter 11 case,

were all owned by Shumate. *See*, **Exhibit 17** attached hereto as to TPCI. Pollard is an active member of the Conspiracy including committing perjury in several respects before the US Trustee and this bankruptcy court, including signing the original Schedules and Statement of Affairs of Plaintiff containing significant false facts and statements, all which Pollard knew were false, and which were made with the intent that Plaintiff and US Trustee rely on. The false testimony and false representations about CWS have caused significant damages including the damages of the actions of the Conspiracy has taken while knowingly and deliberately hiding the truth of the estate of CWS.

107. Plaintiff claims an equitable interest in the TPCI funds and assets acquired with those funds as well as claims for actual and punitive damages against TPCI and the Conspiracy.

108. Entity-Defendant Tim Pollard Construction, Inc. is an alter ego of the Conspiracy.

    **xxi.**    **Texas Coast Builders, LLC** ("TCB")

109. TCB was a recipient of funds from the Plaintiff-Debtor and the Deposit Account and was permitted to use the Debtor's yard in Corpus as its main office at no cost. TCB is owned by Shumate. *See* **Exhibit 18** attached hereto as examples of the Plaintiff-Debtor's funds wrongfully transferred to TCB. Plaintiff claims an equitable interest in those funds and assets acquired with those funds as well as claims for actual and punitive damages against TCB and the Conspiracy.

110. Entity-Defendant Texas Coast Builders, LLC is an alter ego of the Conspiracy.

    **xxii.**    **WFO, LLC** ("WFO"):

111. WFO was a recipient of commingled Deposit Account funds on multiple occasions. WFO purchased a home in Bexar County using Deposit Account funds. On information and belief, WFO has received funds from the Midland Operation generated after the Plaintiff-Debtor's bankruptcy filing. *See*, **Exhibit 19** attached hereto.

112.     Additionally, as noted by the US Trustee's office in its Motion to Convert WFO to a liquidating Chapter 7 case, reflecting illegal and fraudulent pre-bankruptcy conduct, shortly before the WFO Chapter 11 filing WFO transferred at least possession and control of all its operating assets to Lone Star Cement, LLC, an Entity-Defendant owned by Shumate, for no consideration. [*See*, U.S. Trustee's Motion to Convert pending in the WFO Chapter 11 case]. Just as the Midland operation, Lone Star has paid nothing for the WFO use and possession of the assets and has carried on the same business as pre-Chapter 11 WFO operations and has failed to report the full disclosure of such operations and the source and use of funds generated.

113.     Plaintiff-Debtor claims an equitable interest in those funds paid over to WFO and assets acquired with those funds as well as claims for actual and punitive damages against WFP and the Conspiracy.

114.     Entity-Defendant WFO, LLC is an alter ego of the Conspiracy.

### xxiii     WFO Homes, LLC ("WFOH")

115.     WFOH is an LLC owned by Pollard which according to deed records has title in Texas to only one tract of real estate which was acquired on January 17, 2024. Pollard currently resides in the home on tract of land.   On information and belief, Plaintiff-Debtor has funded from the Deposit Account, at the direction of the Conspiracy, on numerous occasions to SRMT.  Although WFOH has no business operations with SRMT it has received in 2024, prior to its bankruptcy, $37,400.00. *See*, **Exhibit** 34.  Plaintiff-Debtor believes that the transfer of these funds was not from operations of SRMT but by funneling the Plaintiff-Debtor's funds through to WFOH.

116.     Entity-Defendant WFO Homes, LLC is an alter ego of the Conspiracy.

### xxiv     William H Holdings, LLC ("WHH")

117.     As described above regarding BLEH, WHH was a transferee of real estate from BL Equity Holdings, LLC which, on information and belief, paid no consideration or less than

adequate consideration for the transfer. Jerry Miller, an Individual-Defendant and a member of the Conspiracy, is a member of WHH and on information and belief the Kenedy County, Texas land transaction is a sham transaction participated in by WHH and Jerry Miller in concert with the Conspiracy to hide and park assets. *See*, **Exhibit 20** attached hereto.

118.     Plaintiff-Debtor claims a legal or equitable interest in those funds and assets acquired with those funds as well as claims for actual and punitive damages against William H Holdings, LLC, and the Conspiracy members.

119.     Entity-Defendant William H Holdings, LLC is an alter ego of the Conspiracy.

**E.**     **Joint and Several Liability to Plaintiff by the Conspirators and the Entity-Defendants:**

The Plaintiff-Debtor's funds were used to start the various of the Entity-Defendants, to support their respective operations, or to funnel Deposit Account funds and Plaintiff's assets, opportunities, and even its going concern to the Conspiracy, primarily Shumate, or to the Conspiracy members. The Entity-Defendant were fraudulently used in the scheme orchestrated by Shumate and the Conspiracy and repeated (*See, e.g.* CESGH's Midland operations and Lone Star Cement operations), with the assistance of the Individual-Defendants, treating the Entity Defendants as an alter ego of the Conspiracy.  Each Entity-Member except Plaintiff-Debtor has benefitted from the funds and assets of Plaintiff-Debtor, and each Entity-Defendant cannot, in equity and good conscience, retain the benefits of this fraud.  Accordingly, as a reverse of an alter ego and veil piercing claims and causes of action, each Entity-Defendant is indebted to the Plaintiff-Debtor for the funds furnished to it by the actions of the Conspiracy caused it to take, and the value of the benefits each Entity-Defendant received as the Conspiracy's conduct, using the Entity-Defendants, to totally denude Plaintiff of all assets and all tangible and intangible value of its ongoing enterprise.  The actions of the Conspiracy violated Sec. 101.206(a) of the Tx. Bus. Org. Code by wholly denuding Plaintiff-

CWS and thereafter paying funds to and for the benefit of the Conspiracy, and primarily Shumate.[35]

120.     Because the comingling, the willful and intentional destruction and spoliation of evidence, each member of the Conspiracy, and the Conspiracy, are jointly and severally liable for all damages to Plaintiff caused by the conduct of the Conspiracy and each alter ego Entity-Defendant.

121.     Likewise, because the Entity-Defendants were operated for the sole purpose of Perpetrating and Perpetuating a fraud and operating to perpetuate a fraud "as if" a single business entity exists, each Entity-Defendant, in fairness and equity, is jointly and severally liable for all damages caused by this single business operation.

**F.      Punitive Damages**:

122.     As a direct and proximate result of the multiple frauds and breach of fiduciary duty set out in this Complaint by the Individual Defendants, each such Individual Defendants, and such other John Doe Individual Defendants that may be discovered, are liable to the Plaintiff for Punitive Damages in an amount determined by the Court, which amount should exceed three times the actual damages found and awarded.

**G.      The "Resulting Trust" Under Texas Law in Favor of Plaintiff's Ownership of Equipment Purchased with the Debtor's Funds:**

123.     The Plaintiff-Debtor's wireline equipment was purchased by Plaintiff-Debtor from its revenues and funds, including wireline equipment purchased with Deposit Account funds and with its Operating Account funds, under the facts of this case and the applicable Texas law, was burdened with a resulting trust in favor of Plaintiff and superior equitable title if title was held in another person's or entity's

---

[35]      This Section provides:
         (a)  Unless the distribution is made in compliance with Chapter 11, a limited liability company may not make a distribution to a member of the company if, immediately after making the distribution, the company's total liabilities, other than liabilities described by Subsection (b), exceed the fair value of the company's total assets.

First Amended Complaint

name.

124.     On each occasion that Plaintiff's funds were used to acquire wireline assets unique to Plaintiff's wireline business,[36] and kept separate and apart from the business of the other Entity-Defendants, and where such equipment was retained in the possession of Plaintiff who exclusively used, repaired, insured, and otherwise exercised total dominion and control, gave rise to a Resulting Trust as a matter of law when, as here, title was put in the name of CES, without consideration, and where the Plaintiff-Debtor continued use and possession of the equipment, maintained the equipment, paid ad valorem taxes on the equipment.

125.     In such event the recording of legal title in the name of a third party (*e.g.*, here CES) gave rise under Texas law to a "resulting trust" in favor of Plaintiff along with superior equitable title to the mere legal title holder.  [*See*, Note 26 *supra*, 33 *infra*]. The Resulting Trust also imputes a superior right of CWS over any third-party having knowledge of the event giving rise to the Resulting Trust, or having access to facts and events that imputes such knowledge.[37] Simmons Bank required that this transaction take place and thus

---

[36]     At no time did any Individual-Defendant or Entity-Defendant conduct wireline-type operations so none of the wireline equipment purchased was done so to support operations of another entities' business, in particular not CES or CESGH.  All such operations were exclusively conducted by Plaintiff-Debtor utilizing equipment that was acquired with its funds or equipment that Plaintiff constructed, improved, or otherwise acquired.  In fact, CWS did acquire equipment with its own funds or with its own lending and credit.  *See*, **Exhibit 31** illustrating the secured lending of CWS.  Likewise, at the time of the MainStreet loan there was approximately $6 millions funded to pay off secured claims of CWS.  On information and belief, the co-owners of interests in CWS were not aware that the Conspiracy had determined to adjust the account to reflect false entries on CWS ownership of assets.  The two operators and managers of CWS prior to Tim Pollard both indicate that they had no idea that records were being manipulated to show that CWS owned no assets at all, and both indicate that CWS owned approximately $25 million in assets.

[37]     *Smith v. Sumeer Homes, Inc.*, No. 05-11-01632-CV, 2013 Tex. App. LEXIS 6965, at *7-8 (Tex. App. June 6, 2013) illustrates the Texas law favoring the "real title" holder as the party holding the "equitable" interest:
    While "legal title" to property evidences apparent ownership, it "does not necessarily signify full and complete title or a beneficial [*8] interest." *Longoria v. Lasater*, 292 S.W.3d 156, 165 (Tex. App.—San Antonio 2009, pet. denied). Rather, it is the "[o]wnership of the equitable estate [that] is the real ownership, and *the legal estate is no more than the 'shadow following the equitable estate,' which is the substance* . . . ." *Neeley v. Intercity Mgmt. Corp*., 623 S.W.2d 942, 951 (Tex. App.—Houston [1st Dist.] 1981, no writ) (quoting *Patty v. Middleton*, 82 Tex. 586, 17 S.W. 909, 912 (Tex. 1891)).
    *Id*. at *7-*8  [Emphasis added].
    *Equitable title is superior to legal title* and may be asserted as a complete defense against the lien of a debtor's judgment creditor. *Cadle Co*., 46 S.W.3d at 287; *see also Tex. Am. Bank/Levelland v. Resendez*, 706 S.W.2d 343, 346-47 (Tex. App.—Amarillo 1986, no writ); *Hammett v. McIntire*, 365

had full knowledge that title to the Plaintiff-Debtor's assets would be taken in exchange for a net-zero benefit

to the Plaintiff-Debtor (it transferred assets in exchange for payment of a lien against those assets – thus it had

its lien paid but it lost the asset and netted nothing). Likewise, Simmons Bank knew that in the transfer the

Plaintiff-Debtor was rendered insolvent because it had no assets, and it had a new $20 million liability to

Simmons Bank.

126.     Accordingly, Plaintiff claims either the ownership of each such piece of wireline equipment

and assets free from any third-party claims of Simmons Bank, purchased with Plaintiffs funds and exclusively

used by Plaintiff in its wireline business (including the Corpus Christi Agnes Street yard), as the superior

equitable and beneficial interest of the resulting trust created by such purchase scheme and seeks a declaration

that:

   a.   the sole beneficiary of the Resulting Trust is CWS;

   b.   the claim to title by CES or their assigns is inferior to the Equitable title held by the Resulting

        Trust; and

   c.   No Individual-Defendant or Entity-Defendant, or any person claiming rights by transfer,

        assignment or hypothecation by or through any such Individual Defendant or Entity-

---

S.W.2d 844, 847 (Tex. Civ. App.—Houston 1962, writ ref'd n.r.e.) (holding abstract of judgment against holder of legal title does not attach to equitable title).

*Id*. at \*9. [Emphasis added.]. And it makes no difference if proof of the retention of the equitable title is established by parol evidence, including as here a multi-year's history of exclusive use by the Debtor of an asset the Debtor's Insiders put in their own name. *Siddiq v. Hawkins*, No. 05-09-00581-CV, 2011 Tex. App. LEXIS 5869, at \*7-\*8 (Tex. App. July 29, 2011) makes this clear:

> "Equitable rights in real property owned by someone other than the debtor, *which rest in parol*, will be protected against a judgment lien." *Gaona v. Gonzales*, 997 S.W.2d 784, 787 (Tex. App.—Austin 1999, no pet.); *Carlisle v. Holland*, 289 S.W.116, 118 (Tex. Civ. App.—El Paso 1926, writ ref'd); *see First State Bank of Amarillo v. Jones*, 107 Tex. 623, 183 S.W. 874, 876 (1916). [Emphasis Added.]

A person owns an "equitable interest" in property by virtue of "an equitable title or claim [] on equitable grounds, *such as the interest held by a trust beneficiary*." *Longoria v. Lasater*, 292 S.W.3d 156, 165 (Tex. App.—San Antonio 2009, pet. denied). "Equitable title" is "a title that indicates a beneficial interest in property and that gives the holder the right to acquire formal legal title." *Id*. On the other hand, a "legal interest" is "an interest recognized by law, such as legal title." *Id*. "Legal title" is "a title that evidences apparent ownership <u>but does not necessarily signify full and complete title or a beneficial interest.</u>" (Emphasis Added.)

First Amended Complaint

Defendant, has a superior right over the rights of Plaintiff-Debtor.

127. Alternatively, Simmons Bank, as a result of the closing of the MainStreet Loan, was an initial transferee with notice of the Resulting Trust, of the fraudulent transfer of Plaintiff-Debtor's property, which transfer was for far less than fair value, which resulted in the insolvency of the Plaintiff-Debtor and was made to hinder, delay or defraud Plaintiff-Debtor and its creditors.

## V.
## CAUSES OF ACTION

128. The Conspiracy described above was founded in fraud and deceit, with each participant [Shumate the leader; Higgins the manipulator of records and accounting; Pollard the manager of the operations and implementation of the Conspiracy's direction; and Kroseche the business "advisor"]. Plaintiff complains of the participatory, joint and several, liability of the Individual-Defendants as members of the Conspiracy to commit and perpetuate fraud. Each Individual-Defendant is liable and responsible for the acts of the others that were done in furtherance of the common purpose no matter when they joined the Conspiracy and whether or not each Individual-Defendant committed any act to further the goal of perpetrating and perpetuating fraud.

### A.  Alter Ego and Reverse Alter Ego -Piercing the Corporate Veil

129. Plaintiff incorporates the allegations of fact and conclusions set out in paragraph 1 through 114 above, as if set out herein verbatim.

130. Each of the Entity-Defendants[38] have knowingly, intentionally, and directly abused the LLC and corporate form as a sham to perpetuate such that the Individual-Defendants are liable

---

[38]  Although included in the defined term "Entity-Defendants," Plaintiff excludes 17 Main, LLC claims of liability as an alter ego of the Conspiracy. Plaintiff does not intend to pursue claims against Superior Ready Mix of Texas, LLC or WFO, LLC unless and until the bankruptcy court modifies the automatic stay to permit such action.

for the causes of actions that could otherwise be brought only against the Entity-Defendants. Proof of this vicarious liability by piercing the corporate veil[39] include the following:

131. The Conspiracy used the Entity-Defendants as a sham to perpetrate a fraud primarily the Control Group (the Individual-Defendants) to siphon off corporate revenues and sell corporate assets to avoid corporate debt or Plaintiff's debt and when the corporate assets and business was taken and used in a new corporate form (e.g. CESGH's Midland Operations) in order to avoid creditors and to commit bankruptcy fraud by filing false sworn schedules and giving false testimony in official bankruptcy proceedings.[40]

132. The Conspiracy organized, controlled and used the Entity-Defendants as a mere tool or business conduit of the Conspiracy in such a manner that the separateness of the Entity-Defendant has ceased, and as its "alter ego"[41] such that holding only the Entity-Defendant liable would cause an injustice and a grave inequity.

133. The Conspiracy controlled and used the Entity-Defendants to evade existing legal obligations, including evading of the fiduciary duty of a control person or professional person committing fraud, and to avoid paying personal debts the Individual-Defendants owed to Plaintiff through the manipulation of the Entity-Defendant.[42]

134. The Conspiracy controlled and used the Entity-Defendants to circumvent statutory liability, including tax liabilities to the State of Texas and the United States.[43]

---

[39]    See, Tex.Bus. Orgs. Code §21.223(b);  *Castleberry v.Branscum*, 721 S.W.2d 270, 272 & n.3 (Tex. 1986)
[40]    *See, e.g. Klein v. Sporting Goods, Inc*. 772 S.W.2d 173, 175-176 (Tex. App. Houston [14th Dist.] 1989, writ denied)
[41]    *See, e.g. Mancorp, Inc. v. Culpepper,* 802 S.W.2d 226, 228 (Tex. 1990).

[42]    *See, e.g. Valley Mech. Contractors, Inc. v. Gonzales,* 894 S.W.2d 832, 36 (Tex. App. – Corpus Christi 1995, no writ).

[43]    *See, e.g. SSP Partners. V. Gladstrong Invs*. 275 WS.W.3d 444, 456 (Tex. 2008).

135. The Conspiracy controlled and controlled and used the Entity-Defendants to protect against the discovery of a crime (including tax fraud, bankruptcy fraud, theft of property, false oath and false swearing) or to justify a wrong.[44]

136. The Conspiracy controlled and knowingly undercapitalized the Entity-Defendants and made up for this conduct by depriving Plaintiff (and Plaintiff's creditors) of its earnings and assets or by secreting or hiding assets from legitimate creditors.

137. The Conspiracy used the Entity Defendants to perpetrate actual fraud and perpetrated an actual fraud on the Plaintiff primarily for the direct personal benefit of the Conspiracy and the co-conspirators Individual-Defendants. Each Entity-Defendant is an alter ego of the Conspiracy and, accordingly, the Conspiracy is liable for all of the debts and obligations each Entity-Defendant owe Plaintiff-Debtor, including but not limited to the advances of funds, taking of equipment, personal property, and opportunities of the Plaintiff, conversion of its going concern value by taking employees, customers and customer lists, vendor and vendor contracts (including MSA for wireline services), and intangibles such as telephone numbers, corporate name and identity, world-wide web presence including the Plaintiff's web site, LinkedIn cite (which is still operating and reporting an active business).

138. Plaintiff seeks all actual damages proximately caused by the conduct of the Conspiracy and each Entity Defendant as well punitive damages for the fraud and breach of duty owed Plaintiff by all Individual Defendants.

**A.      Recovery of Property and Title To Property the Subject of a Resulting Trust.**

139. Plaintiff incorporates the allegations of fact and conclusions set out in paragraph 1 through 127 above, as if set out herein verbatim.

---

[44]      See, Tex. Bus. Orgs. Code §21.223(b).

140.     As among the Conspiracy, the co-conspirator Individual-Defendants, and the Entity Defendants, only Plaintiff performed "wireline services" to the oil and gas sector.   In that business, the Plaintiff-Debtor purchased over $25 million in wireline equipment, including employee vehicles with the Cinch Wireline name and "log" displayed;  large wirelines service trucks with the Cinch Wireline name and "log" displayed; and other rolling stock of cranes and related equipment to perform the wireline business all of which the Cinch Wireline name and "log" displayed, and several million dollars of specialty tools and equipment necessary for wireline work (the "Wireline Assets").

141.     The funds used to purchase or pay for the Wireline Equipment were taken out of the Deposit Account (which the Conspiracy caused to be deposited and co-mingled with the funds of CES ) or from the CWS Operating Account.

142.     On each occasion that Plaintiff's funds were used to acquire the Wireline Assets, all unique to its wireline business, and kept separate and apart from the business assets of the other Entity-Defendants, it was the practice of the Conspiracy to record title in the name of a CES and not Plaintiff, even though the use remained with the Plaintiff.   That is, even though Plaintiff was not recorded as the owner of the Wireline Assets it purchased, it was the user of the Wireline Assets, marked all significant Wireline Assets with the Cinch Wireline name and logo, maintained and protected the wireline equipment.

143.     Under these circumstances, where one party pays for an asset and another party takes legal title (but not possession), and the use of the asset is reserved to the party paying for the asset and for its maintenance and protection, Texas law recognizes a resulting trust (herein referred to as the "Resulting Trust") in favor of Plaintiff, and creates the equitable title that is superior to the legal title holder and superior to any third party having knowledge or access to facts and events that imputes such knowledge.

144.     Plaintiff claims either the ownership of each such piece of Wireline Assets or the real property (including the Corpus Christi Agnes street yard) or the equitable title holder as the beneficial interest of the resulting trust created by such purchase scheme.

145.     Plaintiff is entitled to return of the Wireline Assets, free from any claims or liens held by any third-party with actual or imputed (constructive) notice of the claim of Plaintiff, or alternatively, a money judgment against the Conspiracy, the Individual-Defendants and each Entity-Defendant that holds such Wireline Assets.

146.     Plaintiff seeks judgment against the Individual-Defendants and each Entity-Defendant that holds, or held and disposed of, such Wireline Assets, and free from any lien claim by any third party with actual or imputed knowledge.

**B.      Perpetrating and Perpetuating a fraud at Common law including and fraudulent non-disclosures and false representations.**

147.     Plaintiff incorporates the allegations of fact and conclusions set out in paragraph 1 through 127 above, as if set out herein verbatim.

148.     The Conspiracy made, and cause the Entity-Defendants to knowingly make, false and material representations to the Plaintiff, including false entries on the books and records of the Plaintiff.

149.     The Conspiracy knew, and its knowledge was imputed to the Entity-Defendants, that the representation was false when made or made the representation recklessly as a positive assertion and without knowledge of its truth.

150.     The Conspiracy intended, and its intent was imputed to the Entity-Defendants, that the Plaintiff act on it and the Plaintiff did act on it (including but not limited to Plaintiff's filing false tax returns, false statements to a bankruptcy court, signing false affidavits, giving false testimony).

151.    The false representations caused the Plaintiff injury, both actual damages and set out below.

152.    Plaintiff is entitled to judgment against the Individual Defendants and the Entity Defendants, jointly and severally, for all actual damages (as set out below) and because the injury was caused intentionally through acts of fraud, breach of duty, and other tortious conduct Plaintiff is entitled to recover punitive damages jointly and severally from the Individual Defendants.[45]

C.    **Perpetrating and Perpetuating a fraud by Statutory fraud Chapter 27, Texas Bus.& Comm Code § 27.01 *et.seq*. fraud in Real Estate Transactions and fraud in the sale of stock.**

153.    Plaintiff incorporates the allegations of fact and conclusions set out in paragraph 1 through 127 above, as if set out herein verbatim.

154.    The Conspiracy entered into numerous transactions involving real estate and stock in the various Entity-Defendants and Plaintiff.

155.    The Conspiracy made, and cause the Entity-Defendants to knowingly make, false and material representations of fact to the Plaintiff, including false entries on the books and records of the Plaintiff and failure to records its ownership and title to real and personal property it paid for.

156.    The Conspiracy intended, and its intent was imputed to the Entity-Defendants, that the Plaintiff act on it and the Plaintiff did act on it (including but not limited to Plaintiff's filing false tax returns, false statements to a bankruptcy court, signing false affidavits, giving false testimony).

157.    The Conspiracy caused Plaintiff to modify its corporate agreements and admit additional members under the terms of a purchase contact when the Conspiracy did not intend to

---

[45]    *See, e.g., Tony Gullo Motors I, L.P. v. Chapa*, 212 S.W.3d 299, 304 (Tex. 2006).

cause the Plaintiff to perform under the contract after payment was made.

158. The false representations caused the Plaintiff injury, both actual damages and as set out below.

159. Plaintiff is entitled to judgment against the Individual Defendants, jointly and severally, for all actual damages (as set out below) and because the injury was caused intentionally through acts of fraud, breach of duty, and other tortious conduct Plaintiff is entitled to recover punitive damages jointly and severally from the Individual Defendants.

**D.** **Perpetrating and Perpetuating a fraud by Defalcation While Acting in a Fiduciary Capacity Or In a Special Relationship.**

160. Plaintiff incorporates the allegations of fact and conclusions set out in paragraph 1 through 127 above, as if set out herein verbatim.

161. Each member of the Conspiracy, as well as the Conspiracy, was a fiduciary to Plaintiff, as its control persons and as professional persons employed to perform professional services.

162. Each member of the Conspiracy, as well as the Conspiracy, breached their duties by multiple wrongful defalcations (including conversion of Plaintiff's assets, employees, customers, vendor relations and contracts, opportunities, and going concern value).

163. As a direct and proximate result of the fraud by defalcation of a fiduciary, Plaintiff has suffered actual damages as set out below.

164. Because the defalcation was committed by a fiduciary and was fraudulent, Plaintiff is entitled to recover punitive damages against the Individual-Defendants and the Conspiracy.

**E.** **Perpetrating and Perpetuating a fraud by acts of Bankruptcy Fraud including the fraud described in 18 U.S.C.§ 151,** *et seq***., perjury and false oath in filings and perjury and false oaths in Bankruptcy Court proceedings testimony.**

165. Plaintiff incorporates the allegations of fact and conclusions set out in paragraph 1 through 127 above, as if set out herein verbatim.

166. Plaintiff is the qualified and acting Trustee of the Chapter 7 estate of Cinch Wireline Services, LLC and the allegations of this cause of action relate to conduct undertaken by the Conspiracy and the Individual Defendants after the Petition Date of this case.

167. The Individual Defendants have knowingly and intentionally committed acts of bankruptcy fraud through false statements set out in bankruptcy filings, including the Statement of Affairs of the Plaintiff and Schedule of Creditors. Additionally, the Individual-Defendants have submitted false statements in violation of 18 U.S.C. §152(3). The Conspiracy and its co-conspirators Individual Defendants have falsely testified under oath and under penalty of perjury, in bankruptcy proceedings, including the § 341 Meeting of Creditors and hearing before the bankruptcy Court in violation of 18 U.S.C. §152(2).

168. The Conspiracy and its co-conspirators Individual Defendants have knowingly and fraudulently concealed from a custodian, trustee, marshal, or other officer of the court charged with the control or custody of property, or, in connection with a case under title 11, from creditors or the United States Trustee, any property belonging to the estate of the Plaintiff-Debtor in violation of 18 U.S.C. § 152(1).

169. The Conspiracy and its co-conspirators Individual Defendants have knowingly and fraudulently received any material amount of property from a debtor after the filing of a case under title 11, with intent to defeat the provisions of title 11 in violation of 18 U.S.C. §152(5).

170. The Conspiracy and its co-conspirators Individual Defendants have, in a personal capacity or as an agent or officer of any person or corporation, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the

provisions of title 11, knowingly and fraudulently transferred or concealed *the property of such other person or corporation (being Plaintiff-Debtor)*.

171.    The Conspiracy and its co-conspirators Individual Defendants have, after the filing of a case under title 11 or in contemplation thereof, knowingly and fraudulently conceals, destroys, mutilates, falsifies, or makes a false entry in any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of the Plaintiff-Debtor.

172.    The Conspiracy and its co-conspirators Individual Defendants have, after the filing of a case under title 11, knowingly and fraudulently withholds from a custodian, trustee, marshal, or other officer of the court or a United States Trustee entitled to its possession, any recorded information (including books, documents, records, and papers) relating to the property or financial affairs of the Plaintiff-Debtor.

173.    As a direct and proximate result of the bankruptcy fraud, Plaintiff-Debtor has been damaged in loss of property, loss of funds, loss of value to the estate's interest in the going concern of the Plaintiff-Debtor and its intangible good will, customer list, among other actual damages.

174.    Plaintiff seeks judgment, joint and severally, against the Individual-Defendants and the Entity-Defendant CESGH and because the intention conduct was illegal and fraudulent Plaintiff seeks punitive damages as set out herein below.

**F.      Perpetrating and Perpetuating a fraud by repeated acts of Fraudulent Transfers among the Entity-Defendants or the Individual Defendants, utilized to hide assets in and among the Entity-Defendants or Affiliates, or to dispose of assets for less than their fair equivalent value to further the conspiracy return to the co-conspirator member Individual-Defendants**.

175.    Plaintiff incorporates the allegations of fact and conclusions set out in paragraph 1 through 127 above, as if set out herein verbatim.

176.    The Conspiracy and its co-conspirators Individual Defendants have, in a personal capacity or as an agent or officer of the Plaintiff-Debtor, in contemplation of a case under title 11 by or against the person or any other person or corporation, or with intent to defeat the provisions of title 11, knowingly and fraudulently transferred or concealed *the property of such other person or corporation (being Plaintiff-Debtor).*

177.    As a direct and proximate result of this fraud, Plaintiff-Debtor has been damaged in loss of property, loss of funds, loss of value to the estate's interest in the going concern of the Plaintiff-Debtor and its intangible good will, customer list, among other actual damages.

178.    Plaintiff seeks judgment, joint and severally, against the Individual-Defendants and the Entity-Defendant CESGH and such other involved Defendant-Entity, and because the intentional conduct was illegal and fraudulent Plaintiff seeks punitive damages as set out herein below, jointly and severally against the Individual-Defendants and the Entity-Defendant CESGH.

**G.    Perpetrating and Perpetuating a fraud by accounting manipulations, false entries, false filing of tax returns for the purpose of tax evasion, and intentional malice to injure the public and Plaintiff.**

179.    Plaintiff incorporates the allegations of fact and conclusions set out in paragraph 1 through 127 above, as if set out herein verbatim.

180.    Substantial portions of the accounting and business records in the possession of the Conspiracy were destroyed and digital versions were erased after the Conspiracy was given notice of the bankruptcy and subpoenas issues in this bankruptcy case to produce the books and records of the Plaintiff-Debtor.

181.    Several members of the Conspiracy are under federal investigation for tax fraud or for conduct related to the record keeping and federal tax returns.

182.    The federal tax returns, on information and belief, are false, include significant claims of fraudulent business deductions and fail to account for millions of dollars in distributions from the Entity-Defendants to members of the Conspiracy, primarily Shumate.

183.    On information and belief, fraudulent deductions have been taken on the federal tax returns of the Entity-Defendants and on the Individual-Defendants that include deductions that neither recognized under the IRS Tax Code or falsely reported deductions for personal distributions from the Plaintiff-Debtor and other Entity-Defendants.

184.    As a direct and proximate result of the false accounting entries, false tax returns, and fraud, Plaintiff-Debtor has been deprived of its property, including assets and cash funds paid over to other Entity-Defendants for the sole benefit of the Conspiracy.

185.    Plaintiff-Debtor seek judgment, jointly and severally, against the Individual Defendants and the Entity Defendants for the funds taken from Plaintiff for the purpose of enriching the Conspiracy and its members and evading applicable taxes.

**H.      Perpetrating and Perpetuating a Fraud by Spoliation of Physical and Digital Evidence That Was Then Under the Control of Bankruptcy Court Orders and Subpoenas**.

186.    Plaintiff incorporates the allegations of fact and conclusions set out in paragraph 1 through 127 above, as if set out herein verbatim.

187.    Upon notice being given and received by the Conspiracy, including notice to produce documents and digital evidence, the Conspiracy proceeded to ignore the subpoenas and ultimately bankruptcy court orders, and destroyed documents by burning thousands of pages of business records of the Plaintiff and of certain Entity-Defendants and by erasing or otherwise preventing access to the digitally kept books and records of the Individual-Defendants and Entity-Defendants.

188.     As a result of this knowing spoliation of evidence Plaintiff is entitled to a conclusive presumption that the destroyed records would have weighed heavily against the Conspiracy and Individual-Defendants.

189.     As a result of the burning of records such that there can be no proof of the true nature of the documents burned, Plaintiff is entitled to a presumption that the destroyed records all related to fraudulent and intentional conduct of the Individual-Defendants, including shifting the burden of producing evidence or even the burden of persuasion on the fraudulent conduct of the Conspiracy and the Individual-Defendants *to the Conspiracy and the Individual Defendants* against whom the presumption is directed.[46]

**I.     Recovery For Money Had and Received Against All Defendants**

190.     Plaintiff incorporates the allegations of fact and conclusions set out in paragraph 1 through 127 above, as if set out herein verbatim.

191.     The Defendants, either directly or because of piercing the corporate veil of the Entity-Defendants, seeks the return of funds held by these Defendants wrongfully taken from the Plaintiff-Debtor.

192.     "Money" taken from Plaintiff includes both money itself and the equivalent of money, such as property received as money or property converted into money including all assets purchased from the comingled Deposit Account wrongfully recorded in the name of Cinch Energy Services, LLC or other Entity-Defendants.

193.     All such funds and money belong to the Plaintiff in equity and good conscience.[47]

---

[46]     *See*, Fed.R.Civ.Proc. 302.

[47]     *Staats v. Miller*, 243 SW,2d 686, 687 (Tex.1951)

194.    The sole inquiry is whether the defendant received money that rightfully belongs to the Plaintiff.

195.    Plaintiff-Debtor, as a proximate result of the money and funds taken from the Plaintiff, has suffered damages in that amount, including return of the property taken that was purchased with the wrongfully taken funds or the value thereof, and seeks judgment jointly and severally against the Defendants for such amount.

196.    Because the money and funds taken were the result of the Conspiracy acting maliciously and fraudulently Plaintiff is entitled to recover punitive damages which Plaintiff seeks judgment against the Individual-Defendants and Entity-Defendant CES Group Holdings, LLC.

**J.      Declaratory Relief Pursuant to the Federal Declaratory Judgment Act [28 U.S.C. §2201]**

197.    Plaintiff-Debtor incorporates the allegations of fact and conclusions set out in paragraph 1 through 127 above, as if set out herein verbatim.

198.     Plaintiff-Trustee seeks a declaration pursuant to the Federal Declaratory Judgment Act [28 U.S.C. §2201] in connection with the position that Resulting Trust arose under Texas law as a result of CES and Simmons Bank taking title and then pledging more than $24 million, respectively, the assets of Plaintiff-CWS to secure the MainStreet Loan.

199.    Plaintiff-Trustee seeks a declaration pursuant to the Federal Declaratory Judgment Act [28 U.S.C. §2201] in connection with the position that by CWS giving up $24 million+ (being all of its significant assets) in exchange for: (i)  payment from the loan proceeds of $6.7 million liens by its secured creditors of CWS; and (ii)  requiring CWS become liable on the $20 million+ loan, was a fraudulent transfer of its assets to CES and a fraudulently monthly by its payment of 65% of the monthly principal and interest payment; and  (iii)  the transfer was made for less than fair equivalent value;  and (iv) resulted in the insolvency of CWS or left CWS undercapitalized

and without the ability to finance its operations; and (v) was in furtherance of the wrongful and fraudulent conduct of the Conspiracy.

200. Plaintiff-Trustee seeks a declaration pursuant to the Federal Declaratory Judgment Act [28 U.S.C. §2201] in connection with the position that under Texas law a Resulting Trust arose under Texas law and that Plaintiff-Debtor is the sole beneficiary of the Trust which title is superior to the claim of legal title made by CES and superior to the lien and encumbrance claims asserted by Simmons Bank.

201. Alternatively, Plaintiff-Trustee seeks a Declaration and judgment consistent with this bankruptcy court's Declarations against the Conspiracy, against CES for the return of the assets or their value as a result of the fraudulent transfers of the Plaintiff-Debtor's assets, transferred to CES for less than fair equivalent value resulting in the insolvency of the Plaintiff-Debtor and done to hinder, delay, and defraud its creditors, and against Simmons Bank for participation in the fraudulent transfers as an initial transferee with knowledge .

**K.     Recovery of Title To Property the Subject of the Resulting Trust.**

202. Plaintiff incorporates the allegations of fact and conclusions set out in paragraph 1 through 127 above, as if set out herein verbatim.

203. As among the Conspiracy, the co-conspirators Individual Defendants, and the Entity Defendants, only Plaintiff performed "wireline services" to the oil and gas sector.   In that business, the Plaintiff-Debtor purchased over $25 million in wireline equipment, including employee vehicles with the Cinch Wireline name and "logo" displayed; large wirelines service trucks with the Cinch Wireline name and "logo" displayed; and other rolling stock of cranes and related equipment to perform the wireline business, and several million dollars of specialty tools and equipment necessary for wireline work (the "Wireline Assets").

204. The funds used to purchase or pay for the Wireline Equipment were taken out of the Deposit Account into which the Conspiracy and caused to be deposited and co-mingled with the funds of CES.

205. On each occasion that Plaintiff's funds were used to acquire the Wireline Assets, all unique to its wireline business, and separate and apart from the business of the other Entity-Defendants, it was the practice of the Conspiracy to record title in the name of a CES and not Plaintiff, but whose use remained with the Plaintiff. That is, even though Plaintiff was not recorded as the owner of the Wireline Assets it purchased, it was the user of the Wireline Assets and marked all significant Wireline Assets with the Cinch Wireline name and logo.

206. Under these circumstances, where one party pays for an asset and another takes title but not possession, and use is reserved to the party paying for the asset, Texas law recognizes a resulting trust in favor of Plaintiff and creates the equitable title that is superior to the legal title holder and superior to any third-party having knowledge or access to facts and events that imputes such knowledge.

207. Plaintiff claims either the ownership of each such piece of Wireline Assets or the real property (including the Corpus Christi Agnes Street yard) or the equitable title holder as the beneficial interest of the resulting trust created by such purchase scheme.

208. Plaintiff is entitled to return of the Wireline Assets, free from any claims or liens held by any third-party with actual or imputed (constructive) notice of the claim of Plaintiff, or alternatively, a money judgment against the Conspiracy, the Individual-Defendants and each Entity-Defendant that holds such Wireline Assets.

209. Plaintiff seeks judgment against the Individual-Defendants and each Entity-Defendant that holds, or held and disposed of, such Wireline Assets, and free from any lien claim

by any third party with actual or imputed knowledge of the fraudulent transfers, including but not limited to Simmons Bank.

WHEREFORE, Plaintiff John Patrick Lowe, Chapter 7 Trustee for Cinch Wireline Services, LLC prays that the Trustee have judgment as requested above, including injunctive relief, return or turnover of assets, money judgment, declaratory relief and for such other and further relief, at law or in equity, that it may show itself justly entitled.

Dated: June 19, 2024

Respectfully submitted,

*/s/ Shelby A. Jordan*
Shelby A. Jordan
St. Bar No. 11016700
Antonio Ortiz
St. Bar No. 24074839
***JORDAN & ORTIZ, P.C.***
500 North Shoreline Blvd., Suite 804
Corpus Christi, TX 78401
Telephone: 361.884.5678
Facsimile: 361.888.5555
Email:      sjordan@jhwclaw.com
            aortiz@jhwclaw.com
Copy to:   cmadden@jhwclaw.com

*/s/ Butch Boyd*
Butch Boyd
State Bar No. 00783694
Butch Boyd Law Firm, P.C.
2905 Sackett Street
Houston, TX 77098
713.589.8477
713.589.8563 (Fax)
Email: butchboyd@butchboydlawfirm.com

**SPECIAL COUNSEL FOR JOHN PATRICK LOWE, CHAPTER 7 TRUSTEE FOR CINCH WIRELINE SERVICES, LLC**

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served to the below by the CM/ECF system by electronic mail on June 19, 2024:

**Gabi S Canales**
Canales Law Office
5262 S Staples St.
Suite 100
Corpus Christi, TX 78411          representing          **Michael Mendietta**
361-887-4700                                            *(Interested Party)*
361-887-4761 (fax)
gabilaw14@gmail.com
 *Assigned: 05/14/2024*

**Richard L. Fuqua**
Fuqua & Associates, PC
8558 Katy Freeway
Suite 119                                               **Loretta L. Higgins**
77024                                                   24030 Tirso River Court
Houston, TX 77024          representing          Katy, TX 77493
713-960-0277                                            *(Defendant)*
713-960-1064 (fax)
fuqua@fuquakeim.com
 *Assigned: 05/28/2024*

**R. Javier Guerra**
Ray Pena McChristian, PC
9601 McAllister Freeway, Suite 901                      **Jerry Miller**
San Antonio, TX 78216          representing          137 W. Chandler Road
210-341-3554                                            Sarita, TX 78385
210-341-3557 (fax)                                      *(Defendant)*
jguerra@raylaw.com
 *Assigned: 05/20/2024*

**Aaron Matthew Guerrero**
Bond Ellis Eppich Schafer Jones LLP                     **17 Main, LLC**
950 Echo Lane                                           c/o Daniel Namvar, Registered
Suite 120                                               Agent
Houston, TX 77024          representing          9135 Hilllsboro Dr
713-335-4838                                            Los Angeles, CA 90034
832-740-1411 (fax)                                      *(Defendant)*
aaron.guerrero@bondsellis.com
 *Assigned: 04/26/2024*

**Charles A. Newton**                                   **Mark Lopez**
Newtons Law          representing          52 County Road 2011

First Amended Complaint

190 N. Millport Circle
The Woodlands, TX 77382
281-681-1170
281-901-5631 (fax)
chuck@newtons.law

Edna, TX 77957
*(Defendant)*

**Los Cabos Ranch, LLC**
c/o Paul S Kirklin, Registered
Agent

representing    12600 N. Featherwood Drive,
Suite 225,
Houston, TX 77034
*(Defendant)*

**Paul W. O'Finan**
S M Chaudhry, Esq., Attorney at Law
PLLC
14100 San Pedro Ave, Suite 210
San Antonio, TX 78232
(210) 646-9400
(210) 646-0038 (fax)
paul@smcesq.com

**BL Equity Holdings, LLC**
c/o A Registered Agent, Inc
representing    8 The Green, Suite A
Dover, DE 19901
*(Defendant)*

**Timothy Gaines Pollard**
2200 County Road 413
McCoy, TX 78113
*(Defendant)*

**WFO, LLC**
c/o Tim Pollard, Registered
Agent
146 Motts Parkway
Marion, TX 78124
*(Defendant)*

**Jameson Joseph Watts**
Husch Blackwell LLP
111 Congress
Suite 1400
Austin, TX 78701
512-479-1179
512-479-1101 (fax)
jameson.watts@huschblackwell.com
 *Assigned: 06/03/2024*

**CES Group Holdings, LLC**
c/o Frank T. Shumate,
Registered Agent
representing    2200 County Road 413
McCoy, TX 78113
*(Defendant)*

**Cinch Energy Services, LLC**
Mark Lopez, Registered Agent

1102 S. Second
Ganado, TX 77962
*(Defendant)*

**Cinch Investment Holdings, LLC**
2200 County Road 413
McCoy, TX 78113
*(Defendant)*

**FTS Ranch, LLC**
c/o Frank T Shumate Jr,
Registered Agent
2200 County Road 413
McCoy, TX 78113
*(Defendant)*

**FTSJR Holdings, LLC**
c/o Frank T Shumate, Jr,
Registered Agen
2200 County Road 413
McCoy, TX 78113
*(Defendant)*

**Frank Thomas Shumate**
6118 King Trail
Corpus Christi, TX 78414
*(Defendant)*

**Grander Holdings, LLC**
c/o Frank T Shumate Jr,
Registered Agent
2200 County Road 413
McCoy, TX 78113
*(Defendant)*

**Hook N Bull Properties, LLC**
c/o Frank T. Shumate, Jr.
Registered Age
2200 County Road 413
McCoy, TX 78113
*(Defendant)*

**Ocean Floor Holdings, LLC**
c/o A Registered Agent, Inc.
8 The Green, Suite A

Dover, DE 19901
*(Defendant)*

**Ponder Ranch, LLC**
c/o Frank T Shumate Jr,
Registered Agent
2200 County Road 413
McCoy, TX 78113
*(Defendant)*

**Texas Coast Builders, LLC**
c/o Frank T Shumate Jr.
Registered Agent
2200 County Road 413
McCoy, TX 78113
*(Defendant)*

**WFO Homes, LLC**
c/o Tim Pollard, Registered
Agent
146 Motts Parkway
Marion, TX 78124
*(Defendant)*

*/s/ Shelby A. Jordan*
Shelby A. Jordan